# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 14, 2007  Decided April 24, 2009

No. 06-5209

SHAFIQ RASUL, ET AL.,
APPELLANTS/CROSS-APPELLEES

v.

RICHARD MYERS, AIR FORCE GENERAL, ET AL.,
APPELLEES/CROSS-APPELLANTS

———

Consolidated with
06-5222

———

On Remand from the United States Supreme Court

———

*Eric L. Lewis*, *A. Katherine Toomey*, *Michael Ratner*, and *Shayana Kadidal* were on the supplemental briefs for appellants/cross-appellees.

*Michael F. Hertz*, Acting Assistant Attorney General, and *Robert M. Loeb* and *Matthew M. Collette*, Attorneys, were on the supplemental briefs for appellees/cross-appellants.

Before: HENDERSON and BROWN, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* BROWN.

PER CURIAM: The Supreme Court vacated our decision in *Rasul v. Myers*, 512 F.3d 644 (D.C. Cir. 2008) (*Rasul I*), and remanded the case for further consideration in light of *Boumediene v. Bush*, 128 S. Ct. 2229 (2008). *Rasul v. Myers*, 129 S. Ct. 763 (2008). We do not believe *Boumediene* changes the outcome in *Rasul I*. We therefore reinstate our judgment, but on a more limited basis.

We have before us four British nationals who brought an action alleging that they were illegally detained and mistreated at the United States Naval Base at Guantanamo Bay, Cuba, from 2002 until their release in 2004. They named as defendants former Secretary of Defense Donald Rumsfeld and ten senior U.S. military officials. The complaint was in seven counts. Counts 1, 2, and 3 invoked federal jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350, and alleged violations of international law. Count 4 alleged violations of unspecified provisions of the Geneva Convention. Counts 5 and 6 asserted *Bivens* claims for violations of the Fifth and Eighth Amendments to the Constitution. *See Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Count 7 alleged a violation of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb *et seq*.

We affirmed the district court's dismissal of Counts 1 to 4 and Counts 5 and 6 and reversed its denial of the motion to dismiss Count 7. *Rasul I*, 512 F.3d at 672. We agreed that the district court had no jurisdiction over Counts 1 to 4.[1] As to

---

[1] We explained that the Westfall Act makes the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2679 *et seq*., the exclusive remedy

Counts 5 and 6, we ruled against plaintiffs on the merits and held, in the alternative, that even if plaintiffs had rights under the Due Process Clause and the Cruel and Unusual Punishment Clause and even if those rights had been violated, qualified immunity shields the defendants because the asserted rights were not clearly established at the time of plaintiffs' detention. *Id.* at 665–67. As to Count 7, we held that plaintiffs were not among the protected "person[s]" for whom RFRA, 42 U.S.C. § 2000bb-1(a)–(b), creates a private right of action to remedy unjustifiable government burdens on the exercise of religion. *Id.* at 672.

Plaintiffs do not attempt to show how *Boumediene* bears on Counts 1 to 4, and we can see nothing in the Supreme Court's decision that could possibly affect our disposition of those Counts. We shall therefore reinstate our judgment on Counts 1 to 4. With respect to the remaining three Counts, plaintiffs argue that *Boumediene* vitiates our analysis. The gist of their argument is that *Boumediene* prescribes a multi-factor, "functional" test to determine whether aliens in their predicament can invoke constitutional rights, and that the rights they assert pass the test. By extension, they argue that if RFRA mirrors a previous version of the constitutional right of free exercise, then the same functional approach governs RFRA's extraterritorial reach.

---

for any damages action for torts committed by a federal official "while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). The Alien Tort Statute and Geneva Convention claims in Counts 1 to 4 were premised on alleged tortious conduct within the scope of defendants' employment. *Rasul I*, 512 F.3d at 660, 663. Since plaintiffs failed to exhaust their administrative remedies as required by the FTCA, *see McNeil v. United States*, 508 U.S. 106, 113 (1993), the district court lacked jurisdiction over Counts 1 to 4.

4

The main question in *Boumediene* was whether a provision in the Military Commissions Act, Pub. L. No. 109–366, 120 Stat. 2600 (2006) (codified in part at 28 U.S.C. § 2241 & note), depriving federal courts of habeas corpus jurisdiction over petitions filed by Guantanamo detainees, violated the clause of the Constitution governing suspension of the writ, ART. 1, § 9, cl. 2. 128 S. Ct. at 2237. Holding that the Suspension Clause extended to Guantanamo, the Court struck down the jurisdiction-stripping provision of the Military Commissions Act as an unconstitutional suspension of the writ. *Id.* The Court acknowledged that it had never before determined that the Constitution protected aliens detained abroad, *id.* at 2262, and explicitly confined its constitutional holding "only" to the extraterritorial reach of the Suspension Clause, *id.* at 2275. The Court stressed that its decision "does not address the *content of the law* that governs petitioners' detention." *Id.* at 2277 (emphasis added). With those words, the Court in *Boumediene* disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause. *See, e.g., Johnson v. Eisentrager*, 339 U.S. 763 (1950) (holding that aliens detained on a U.S. military base outside sovereign U.S. territory have no due process rights); *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) (holding that the Fourth Amendment does not protect nonresident aliens against unreasonable searches or seizures conducted outside sovereign U.S. territory); *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999); *see also Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009) (holding that alien detainees at Guantanamo cannot invoke the Due Process Clause).

Plaintiffs nevertheless maintain that *Boumediene* has eroded the precedential force of *Eisentrager* and its progeny. Whether that is so is not for us to determine; the Court has

reminded the lower federal courts that it alone retains the authority to overrule its precedents. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). A panel of this court is under another constraint: we must adhere to the law of our circuit unless that law conflicts with a decision of the Supreme Court. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc).

There is another reason why we should not decide whether *Boumediene* portends application of the Due Process Clause and the Cruel and Unusual Punishment Clause to Guantanamo detainees – and it is on this ground we will rest our decision on remand. The doctrine of qualified immunity shields government officials from civil liability to the extent their alleged misconduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Our initial opinion followed the requirement of *Saucier v. Katz*, 533 U.S. 194 (2001), that courts must first determine whether the alleged facts make out a violation of a constitutional right; if the plaintiff satisfies this first step, then the court must determine whether the asserted right was "clearly established" at the time of the violation. *Id.* at 201. After our initial decision, the Supreme Court handed down *Pearson v. Callahan*, 129 S. Ct. 808 (2009). *Pearson* ruled that the *Saucier* sequence is optional and that lower federal courts have the discretion to decide only the more narrow "clearly established" issue "in light of the circumstances in the particular case at hand." *Id.* at 818.

Considerations of judicial restraint favor exercising the *Pearson* option with regard to plaintiffs' *Bivens* claims in Counts 5 and 6. The immunity question is one that we can "rather quickly and easily decide," *Pearson*, 129 S.Ct. at 820 — and already have. *See Rasul I*, 512 F.3d 665–67. We thus follow the "older, wiser judicial counsel 'not to pass on

questions of constitutionality . . . unless such adjudication is unavoidable.'" *Pearson*, 129 S.Ct. at 821 (quoting *Scott v. Harris*, 550 U.S. 372, 388 (2007) (Breyer, J., concurring) (quoting *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944))). In view of *Saucier*, constitutional adjudication was "unavoidable" when we rendered our initial decision, but given *Pearson* that is no longer true.

Our vacated opinion explained why qualified immunity insulates the defendants from plaintiffs' *Bivens* claims. *Rasul I*, 512 F.3d at 665–67. *Boumediene* does not affect what we wrote. No reasonable government official would have been on notice that plaintiffs had any Fifth Amendment or Eighth Amendment rights. *Id.* at 666. At the time of their detention,[2] neither the Supreme Court nor this court had ever held that aliens captured on foreign soil and detained beyond sovereign U.S. territory had any constitutional rights — under the Fifth Amendment, the Eighth Amendment, or otherwise. The Court in *Boumediene* recognized just that: "It is true that before today the Court has never held that noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty have any rights under our Constitution." 128 S. Ct. at 2262.[3]

---

[2] All four plaintiffs were released more than four years before the Supreme Court decided *Boumediene,* and months before the Court held even that statutory habeas corpus jurisdiction extended to Guantanamo. *See Rasul v. Bush*, 542 U.S. 466, 483–84 (2004). We do not require government employees to anticipate future developments in constitutional law. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Butera v. District of Columbia*, 235 F.3d 637, 652 (D.C. Cir. 2001).

[3] We wrote in *Rasul I* that no one had reason to suppose that Guantanamo was within the territorial sovereignty of the United States. 512 F.3d at 666–67. The agreement giving the United States

*Eisentrager* and *Verdugo-Urquidez* were thought to be the controlling Supreme Court cases on the Constitution's application to aliens abroad. *Eisentrager* rejected a habeas petition brought by German nationals imprisoned at a United States military base in Germany. 339 U.S. at 778. The Court held that these alien prisoners, who "at no relevant time were within any territory over which the United States is sovereign," were not entitled to invoke the protection of the writ or the Fifth Amendment. *Id.* The Court referred nine times to the decisive fact that the alien prisoners were, at all relevant times, outside sovereign U.S. territory. *See id.* at 777–78.

"[E]mphatic" is how the Court later described its rejection of the claim that aliens outside the sovereign territory of the United States are entitled to due process rights. *Verdugo-Urquidez*, 494 U.S. at 269 (citing *Eisentrager*, 339 U.S. at 770). Following *Eisentrager*, the Court in *Verdugo-Urquidez* concluded that the Fourth Amendment did not protect nonresident aliens against unreasonable searches or seizures conducted outside the sovereign territory of the United

---

an indefinite lease recognized that the lessor, the Republic of Cuba, retained ultimate sovereignty. *See* Agreement Between the United States and Cuba for the Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, T.S. No. 418, art. III. The Supreme Court recognized this in *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 381 (1948). *See also* Immigration and Nationality Act, 8 U.S.C. § 1101(a)(38). In fact, before *Boumediene*, it was clearly established that "[w]ho is the sovereign, *de jure* or *de facto*, of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges . . . of that government." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) (quoting *Jones v. United States*, 137 U.S. 202, 212 (1890)); *Vermilya-Brown*, 335 U.S. at 380; *see also Lin v. United States*, No. 08-5078, slip op. at 8–9 (D.C. Cir. April 7, 2009).

States. *Id.* at 274–75. The majority noted that although American citizens abroad can invoke some constitutional protections, *id.* at 270 (citing *Reid v. Covert*, 354 U.S. 1 (1957) (plurality opinion)), aliens abroad are in an altogether different situation. *Id.* at 271. The long line of cases dealing with constitutional rights of both lawful resident aliens and illegal aliens establishes "only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* (citing *Plyler v. Doe*, 257 U.S. 202, 212 (1982) (The provisions of the Fourteenth Amendment "are universal in their application, *to all persons within the territorial jurisdiction . . . .*") (emphasis added in *Verdugo-Urquidez*); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n. 5 (1953) ("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But *once an alien lawfully enters and resides in this country* he becomes invested with the rights guaranteed by the Constitution to all people within our borders.") (emphasis added in *Verdugo-Urquidez*)). Those cases could not help an alien who, like Verdugo-Urquidez and plaintiffs in this case, had at no relevant time been in the country and had "no previous significant voluntary connection with the United States," *id.*

As *Rasul I*, 512 F.3d at 666, points out, the law of this circuit also holds that the Fifth Amendment does not extend to aliens or foreign entities without presence or property in the United States. *See People's Mojahedin*, 182 F.3d at 22; *32 County Sovereignty Comm. v. U.S. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002); *see also Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004), *cert. denied,* 543 U.S. 1146 (2005); *Pauling*, 278 F.2d at 254 n.3. We applied this line of authority to Guantanamo during plaintiffs' detention. In *Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003), we held that federal habeas jurisdiction does not extend to Guantanamo and noted

that "[w]e cannot see why, or how, the writ may be made available to aliens abroad when basic constitutional protections are not." *Id.* at 1141. The Supreme Court reversed that decision (on statutory grounds) only after plaintiffs' release. *Rasul*, 542 U.S. at 483–84.

Discounting the precedents we have just described, plaintiffs say their position follows from the century-old *Insular Cases*. A series of Supreme Court decisions from *De Lima v. Bidwell*, 182 U.S. 1 (1901), to *Balzac v. Porto Rico*, 258 U.S. 298 (1922), extended "fundamental personal rights" to inhabitants of the "unincorporated" U.S. territories, such as Puerto Rico, Guam and the Philippines. *See generally Dorr v. United States*, 195 U.S. 138 (1904). The United States maintained complete sovereignty over these territories,[4] and Congress governed the territories pursuant to its Art. IV, § 3, power to regulate "Territory or other Property belonging to the United States." *See Verdugo-Urquidez*, 494 U.S. at 268; *Reid*, 354 U.S. at 13 (plurality opinion); *Eisentrager*, 339 U.S. at 780 (distinguishing *In re Yamashita*, 327 U.S. 1 (1946), on the ground of "our sovereignty at that time over these insular possessions"). Neither factor applies to Guantanamo. The *Insular Cases* therefore could not have "clearly established" that constitutional rights extend to aliens held at Guantanamo.

---

[4] When the United States acquired new territories like those involved in the *Insular Cases*, either through the treaty power or the war power, the ties to the "former sovereign [were] dissolved." *Dorr*, 195 U.S. at 141 (quoting *Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 542 (1828) (Marshall, C.J.)). The agreement between the United States and Cuba expressly disavows such a dissolution of ties to Cuba: "[T]he United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the above described areas of land and water. . . ." Agreement Between the United States and Cuba for the Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, T.S. No. 418, art. III.

In short, there was no authority for — and ample authority against — plaintiffs' asserted rights at the time of the alleged misconduct. The defendants are therefore entitled to qualified immunity against plaintiffs' *Bivens* claims.[5]

This leaves the RFRA claim in Count 7. Our vacated opinion held as a matter of statutory interpretation that plaintiffs were not protected "person[s]" within the meaning of RFRA, 42 U.S.C. § 2000bb-1(a). *Boumediene* could not possibly have altered – retroactively – the meaning of RFRA. We will summarize our analysis in *Rasul I.*

In enacting RFRA, Congress intended to incorporate the standard governing free exercise claims that prevailed before the Supreme Court's 1990 decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). *See City of Boerne v. Flores*, 521 U.S. 507, 515 (1997). The aim was to restore what, in Congress's view, is the free exercise right the Constitution guaranteed — in both substance and scope. We therefore held that the term "person" as used in RFRA should be read

---

[5] There is an alternative ground for dismissing plaintiffs' *Bivens* claims. As Judge Brown noted in her initial concurrence, federal courts cannot fashion a *Bivens* action when "special factors" counsel against doing so. *Rasul I*, 512 F.3d at 672–73 (Brown, J., concurring) (quoting *Chappel v. Wallace*, 462 U.S. 296, 298 (1983)). The danger of obstructing U.S. national security policy is one such factor. *See Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985). *Sanchez-Espinoza* held that "the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad." *Id*. We see no basis for distinguishing this case from *Sanchez-Espinoza*. *See Rasul I*, 512 F.3d at 673 (Brown, J., concurring). Plaintiffs' *Bivens* claims are therefore foreclosed on this alternative basis, which is also unaffected by the Supreme Court's *Boumediene* decision.

consistently with similar language in constitutional provisions, as interpreted by the Supreme Court at the time Congress enacted RFRA. *Rasul I*, 512 F.3d at 670–72. Congress legislated against the background of precedent establishing that nonresident aliens were not among the "person[s]" protected by the Fifth Amendment, *Eisentrager*, 339 U.S. at 783, and were not among "the people" protected by the Fourth Amendment, *Verdugo-Urquidez*, 494 U.S. at 269. *See also Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1428 (11th Cir. 1995) (Cuban and Haitian refugees at Guantanamo Bay lack First Amendment rights). Reading RFRA in line with these precedents, we held that plaintiffs are not protected "person[s]" under this statute. *Rasul I*, 512 F.3d at 672. We reinstate that judgment today.[6]

For the foregoing reasons, we affirm the district court's dismissal of Counts 1, 2, 3, 4, 5 and 6 of plaintiffs' complaint and reverse the district court's denial of defendants' motion to dismiss Count 7.

*So ordered.*

---

[6] In the alternative, for the reasons stated in Judge Brown's initial concurring opinion, defendants are entitled to qualified immunity against plaintiffs' RFRA claim. *See Rasul I*, 512 F.3d at 676 & n.5. (Brown, J., concurring).

BROWN, *Circuit Judge*, concurring: I join the majority opinion in full as to the plaintiffs' *Bivens* claims and to the extent it disposes of plaintiffs' Religious Freedom Restoration Act ("RFRA") claims under the doctrine of qualified immunity. I write separately because I disagree that the term "person" limits the scope of the RFRA.

I

The majority reinstates its initial holding that plaintiffs cannot bring a RFRA claim because they are not "person[s]" within the meaning of that statute. *See* Maj. Op. 10–11 (summarizing its analysis from *Rasul v. Myers*, 512 F.3d 644, 668 (D.C. Cir. 2008) (*Rasul I*)). Yet, "[a] fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). RFRA does not define "person," so we must look to the word's ordinary meaning. There is little mystery that a "person" is "an individual human being . . . as distinguished from an animal or a thing." WEBSTER'S NEW INTERNATIONAL DICTIONARY 1686 (1981). Unlike the majority, I believe Congress "[did not] specifically intend[] to vest the term 'persons' with a definition . . . at odds with its plain meaning." *Rasul v. Rumsfeld,* 433 F. Supp. 2d 58, 67 (D.D.C. 2006).

The majority does not point to a single statute defining "person" so narrowly as to exclude nonresident aliens from its ambit, and nothing in RFRA's history suggests Congress focused on the term's scope here. RFRA originally provided that "[g]overnment shall not substantially burden a *person's exercise of religion*" unless such a burden is "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1 (1994) (emphasis added). It defined "exercise of religion" as "the exercise of religion *under the First Amendment* to the Constitution." *Id.*

§ 2000bb-2(4) (emphasis added). The reference to the "First Amendment" made it clear that persons who did not have First Amendment rights were not protected by RFRA. Given this clear textual basis, the term "person" did no work as a limiting principle—"First Amendment" did the job.

In the Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, Pub. L. No. 106-274, 114 Stat. 803, Congress amended RFRA's definition of "exercise of religion" to cover "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," and removed the term "First Amendment." *See id.* §§ 7(a), 8(7)(A), 114 Stat. 806, 807. This change was meant to "clarify[ ] issues that had generated litigation under RFRA" by providing that "[r]eligious exercise need not be compulsory or central to the claimant's religious belief system." H.R. REP. NO. 106-219, at 30 (1999); *see also Adkins v. Kaspar*, 393 F.3d 559, 567–68 & n.34 (5th Cir. 2004) (citing pre-RLUIPA cases requiring "the religious exercise burdened to be 'central' to the religion"). Congress wanted to expand RFRA's protections to a broader range of religious practices, *see Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1033 (9th Cir. 2007); there is no indication it wanted to broaden the universe of persons protected by RFRA. However, by removing the term "First Amendment" from RFRA, Congress inadvertently deleted the textual hook precluding persons who did not have First Amendment rights from asserting RFRA claims.

The panel majority attempts to cure the problem created by Congress's careless amendment by constricting the meaning of the term "person." This boils down to a claim that, by removing the term "First Amendment" from RFRA's definition of "exercise of religion," Congress *sub silentio* changed RFRA's definition of "person." But this transforms

statutory interpretation into a game of whack-a-mole: a deleted textual hook does not simply re-appear in another statutory term.

Finding no other support for its constricted definition of "person," the majority turns to decisions interpreting constitutional provisions: *Johnson v. Eisentrager*, 339 U.S. 763 (1950) (Fifth Amendment), and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) (Fourth Amendment). *Eisentrager* rejected this circuit's conclusion that the breadth of the term "person" in the Fifth Amendment expanded the coverage of the Due Process Clause beyond its traditional limits. Nevertheless, nowhere in its extensive discussion did the Court rely on the definition of "person."[1] Its holding turned on the conventional understanding of the Fifth Amendment, the "full text" of that Amendment, and the foreign policy complexities of allowing aliens to assert constitutional rights. *Id.* at 782–83.[2] Moreover, *Eisentrager* interpreted the Due Process Clause; RFRA implements the Free Exercise Clause. The term "person" does not appear in the Free Exercise Clause, *see* U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of

---

[1] Similarly, none of the other Fifth Amendment cases cited in the majority's initial opinion, *Rasul I*, 512 F3d at 668, rely on the definition of "person." *See Jifry v. FAA*, 370 F.3d 1174, 1182–83 (D.C. Cir. 2004) (not mentioning the term "person" in holding nonresident aliens with insufficient contacts do not have Fifth Amendment rights); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999) (same for foreign entities).

[2] In fact, the *Eisentrager* Court repeatedly used the term "person" in its common meaning. *See id.* at 768 n.1 (citing cases brought on behalf of "persons," referring to "German enemy aliens"); *id.* at 783 ("The Court of Appeals has cited no authority whatever for holding that the Fifth Amendment confers rights upon all persons . . . .").

religion, or prohibiting the free exercise thereof . . . ."), and thus the definition of "person" cannot be the reason aliens held abroad do not have free exercise rights.

*Verdugo* is even less helpful to the majority. Unlike *Eisentrager*, *Verdugo* did rely on a definitional analysis, explaining that the Fourth Amendment did not apply to nonresident aliens outside of our borders, in part, because "the people" referred to in the Amendment identifies a "*class of persons* who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. at 265 (emphasis added). While "the people" are merely a "class of persons," the relevant inquiry for RFRA purposes is "who are 'persons'?" The answer is obvious—"persons" are individual human beings, of whom the American people are just one class.

## II

While the majority's approach is untenable, the plaintiffs still do not prevail. RFRA's proscription that "[g]overnment shall not substantially burden a person's exercise of religion" and RLUIPA's new definition of "exercise of religion" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," leave no textual basis for prohibiting suits brought by non-resident aliens held at Guantanamo, or foreign nationals who work for American officials on NATO military bases, or, arguably, jihadists our soldiers encounter on foreign battlefields.[3] While "statutory

---

[3] The term "government" provides no limiting basis since RFRA defines this term as including an "official (or other person acting under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2(1). Defendants, the Secretary of Defense and high-ranking military officers, are unquestionably officials of the

language represents the clearest indication of Congressional intent," we may go beyond the text in those "rare cases" where a party can show that "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Nat'l Pub. Radio, Inc. v. FCC*, 254 F.3d 226, 230 (D.C. Cir. 2001).

The unusual drafting history of RFRA and RLUIPA make this one of those rare cases. RFRA originally only provided for suits for violation of First Amendment rights, which did not include intrusions on the free exercise of those in plaintiffs' position. *See Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1428 (11th Cir. 1995). There is no doubt that RLUIPA's drafters, in changing the definition of "exercise of religion," wanted to broaden the scope of the kinds of practices protected by RFRA, not to increase the universe of individuals protected by RFRA. *See* H.R. REP. NO. 106-219, at 30; *Adkins*, 393 F.3d at 567–68 & n.34; *Navajo Nation*, 479 F.3d at 1033. Literal application of RFRA would force us to hold Congress's careless drafting inadvertently expanded the scope of RFRA plaintiffs. Such a result is "demonstrably at odds with the intentions of [RLUIPA's] drafters." *See Nat'l Pub. Radio*, 254 F.3d at 230.

III

Accepting plaintiffs' argument that RFRA imports the entire Free Exercise Clause edifice into the military detention context would revolutionize the treatment of captured combatants in a way Congress did not contemplate. In

---

United States. Moreover, as the majority points out, since defendants are officials of the United States, it is irrelevant whether Guantanamo Bay Naval Base is a "covered entity." *Rasul I*, 512 F.3d at 667 n.19.

drafting RFRA, Congress was not focused on how to accommodate the important values of religious toleration in the military detention setting. If Congress had focused specifically on this challenge, it would undoubtedly have struck a different balance: somewhere between making government officials' wallets available to every detainee not afforded the full panoply of free exercise rights and declaring those in our custody are not "persons." It would not have created a RFRA-like damage remedy, but it likely would have prohibited, subject to appropriate exceptions, unnecessarily degrading acts of religious humiliation. It would have sought to deter such acts not by compensating the victims, but by punishing the perpetrators or through other administrative measures. *See, e.g.*, Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, §§ 1091 to 1092, 118 Stat. 1811, 2068–71 (2004) (to be codified at 10 U.S.C. § 801 note) (creating an administrative regime to prevent unlawful treatment of detainees); Detainee Treatment Act of 2005, Pub. L. 109-148, § 1003(a), 119 Stat. 2739 (to be codified at 42 U.S.C. § 2000dd) ("No individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment."). Judicial interpretation without text is at best a stop-gap; at worst, a usurpation. In 2000, when Congress amended RFRA, jihad was not a prominent part of our vocabulary and prolonged military detentions of alleged enemy combatants were not part of our consciousness. They are now. Congress should revisit RFRA with these circumstances in mind.