Opinion for the Court filed by Circuit Judge BROWN.
Concurring opinion filed by Circuit Judge KAVANAUGH.
Dissenting opinion filed by Circuit Judge PILLARD.
BROWN, Circuit Judge:
Amir Meshal filed this Bivens action, see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), against several agents of the Federal Bureau of Investigation (“FBI”), claiming they violated his Fourth and Fifth Amendment rights when they detained, interrogated, and tortured him over the course of four months in three African countries. Meshal insists a Bivens remedy in these circumstances is necessary and unexceptional. The government condemns the pro -Bivens rationale applied extraterritorially as unprecedented. The district court found the allegations of federal agents abusing an American citizen abroad quite troubling. So do we. Still, the district court dismissed Meshal’s suit, finding a Bivens action unavailable.
Faced with a shifting paradigm in which counterterrorism and criminal investigation merge, we rely on a familiar framework in an unconventional context. No court has countenanced a Bivens action in a case involving the national security and foreign policy context. And, whAe'Bivens remedies for ill-executed criminal investigations are common, extraterritorial application is virtually unknown. We hold that in this particular new setting — where the agents’ actions took place during a terrorism investigation and those actions occurred overseas — special factors counsel hesitation in recognizing a Bivens action for money damages.
I
Meshal, a United States citizen and New Jersey resident, traveled to Mogadishu, Somalia in 2006 to “broaden his understanding of Islam after the country’s volatile political situation had largely stabilized.”[1] J.A. 15. While he was visiting *419 the country, violence erupted, forcing Meshal to flee to Kenya along with other civilians.
In January 2007, Meshal was apprehended by Kenyan authorities, in a joint U.S.-Kenyan-Ethiopian operation, and transported to Nairobi. A member of Kenya’s Criminal Investigation Department (“CID”) told Meshal that authorities needed to determine “what the United States wanted to do with him” before sending him “back to the United States.” J.A. 31.
Sometime between January 27 and February 3, 2007, U.S. officials learned about Meshal’s detention in Kenya and thus began a lengthy, multi-jurisdictional interrogation in which Defendants Chris Higgen-botham, Steve Hersem, John Doe 1, and John Doe 2 (collectively “Defendants”) had significant roles. Meshal claims Defendants followed the procedures detailing how the FBI should “conduct investigations abroad, participate with foreign officials in investigations abroad, or otherwise conduct activities outside the United States with the written [acquiescence or approval] of the Director of Central Intelligence and the Attorney General or their designees.” J.A. 32 (citing The Attorney General’s Guidelines for FBI National Security Investigations and Foreign Intel-ligenoe Collection 17 (Oct. 31, 2003) (declassified Aug. 2, 2007)).
For the next four months, Meshal claims Defendants detained him in secret, denied him access to counsel and the courts, and threatened him with torture and death. He says he was threatened with extradition to Israel where the Israelis would “make [Meshal] disappear,” J.A. 41; and with rendition to Egypt, where they “had ways of making him talk,” J.A. 42. Defendant Hersem also intimated that Meshal would suffer the same fate as the protagonist in the movie Midnight Express[2] — a movie where a foreign prisoner is brutally beaten and confined in horrid conditions in a Turkish prison for refusing to cooperate. Hersem said, “You made it so that even your grandkids are going to be affected by what you did,” but promised that if Meshal confessed his connection to al Qaeda, he would.be returned to the United States to face civilian courts instead of being returned to Somalia. J.A. 41. Meshal believes the agents hoped to extract a confession to terrorist activity as a prelude to prosecution. The alleged threats had an effect; Meshal’s cellmate observed that Meshal was “extremely distressed and crying” after returning to his cell from one of the interrogations. J.A. 41.
Meshal also alleges he was transferred between three African countries without legal process: from Kenya to Somalia, where he was detained in handcuffs in an underground room, with no windows or toilets, a place referred to as “the cave,” J.A. 48-49; then flown blindfolded to Ad-dis Ababa, Ethiopia, where he was detained in a military barracks. Over the next three months, Ethiopian officials regularly transported Meshal and other prisoners to a villa for interrogation where Does 1 and 2 repeatedly refused Meshal’s requests to speak to a lawyer. When he was not being interrogated, Meshal was handcuffed in his prison cell, and spent several days in solitary confinement.
Eventually, the FBI released Meshal, and he returned to the United States. *420 During the four months he was detained abroad, he lost approximately eighty pounds. He was never charged with a crime.
Meshal filed a Bivens action specifically alleging detention without a hearing for four months violated his Fourth Amendment rights and that the threats of torture and disappearance violated his due process rights. In deciding Defendants’ motion to dismiss, the district court found Meshal had properly stated Fourth and Fifth Amendment claims.[3] Yet the court dismissed the case, concluding a Bivens action was unavailable to Meshal because both this court, and several other circuits, had “expressly rejected a Bivens remedy for [U.S.] citizens who allege they have been mistreated, and even tortured, by [American officials] in the name of intelligence gathering, national security, or military affairs.” Meshal v. Higgenbotham, 47 F.Supp.3d 115, 116-17 (D.D.C.2014).
II
A
Federal tort causes of action are ordinarily created by Congress, not by the courts. Congress has created numerous tort causes of action allowing plaintiffs to recover for tortious acts by federal officers. See, e.g., Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq.; Torture Victim Protection Act, 28 U.S.C. § 1350 Note. But Congress has not created a tort cause of action that applies to this case. The Federal Tort Claims Act, for example, explicitly exempts claims against federal officers for acts occurring in a foreign country. See 28 U.S.C. § 2680(k). The Torture Victim Protection Act provides a cause of action only against foreign officials, not U.S. officials. See 28 U.S.C. § 1350 Note, § 2(a). Having no statutory cause of action, Meshal has sued directly under the Constitution, relying on the Supreme Court’s decision in Bivens.
In 1971, the Supreme Court recognized an implied private action, directly under the Constitution, for damages against federal officials alleged to have violated a citizen’s Fourth Amendment rights. Bivens, 403 U.S. 388, 91 S.Ct. 1999. The case began when Webster Bivens sued Bureau of Narcotics Agents in federal court, alleging facts the Court “fairly read” as claiming Bivens’ “arrest was made without probable cause.” Id. at 389, 91 S.Ct. 1999. Because the alleged constitutional violation had already occurred, Justice Harlan noted that, “[f]or people in Bivens’ shoes, it [was] damages or nothing.” Id. at 410, 91 S.Ct. 1999 (Harlan, J., concurring in judgment).
The Court recognized a federal damages remedy apart from the availability of state common law remedies. See id. at 394-95, 91 S.Ct. 1999. Noting Congress had not specifically provided a remedy for violations of constitutional rights and that “the Fourth Amendment does not in so many words provide for its enforcement by an award of money damages for the consequences of its violation,” id. at 396-97, 91 S.Ct. 1999, the Court nevertheless relied on the rule that “where legal rights have been invaded ... federal courts may use any available remedy to make good the wrong done.” Id. at 396, 91 S.Ct. 1999. Importantly, although no federal statute *421 provided Bivens a right to sue for the invasion of his Fourth Amendment rights, the Court recognized a cause of action because it found “no special factors [coun-selled] hesitation in the absence of affirmative action by Congress.” Id.
Since Bivens, the Supreme Court has proceeded cautiously in implying additional federal causes of action for money damages. In the decade immediately following the ruling, the Court extended Bivens’ reach to claims involving employment discrimination in violation of the Due Process Clause, Davis v. Passman, 442 U.S. 228, 243-45, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and cruel and unusual punishment by prison officials in violation of the Eighth Amendment, Carlson v. Green, 446 U.S. 14, 19-23, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). But over time, the Court gradually retreated from Bivens, rejecting any “automatic entitlement” to the remedy, and noting that “any freestanding damages remedy for a claimed constitutional violation has to represent a judgment about'the best way to implement a constitutional guarantee.... ” Wilkie v. Robbins, 551 U.S. 537, 550, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007).
The best way to implement a particular constitutional guarantee, the Court decided, was to let Congress determine whether it warranted a cause of action. See id. at 562, 127 S.Ct. 2588. Finding either that Congress had provided an alternative remedy or that special factors counseled hesitation, the Court declined to recognize a Bivens action for: 1) a federal employee’s claim that his federal employer demoted him in violation of the First Amendment, Bush v. Lucas, 462 U.S. 367, 368-69, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983); 2) a claim by military personnel that military superiors violated various constitutional provisions, Chappell v. Wallace, 462 U.S. 296, 298-300, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); 3) a claim by Social Security disability benefits recipients that benefits had been denied in violation of the Fifth Amendment, Schweiker v. Chilicky, 487 U.S. 412, 414, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988); 4) a former bank employee’s suit against a federal agency, claiming he lost his job due to agency action violating due process, FDIC v. Meyer, 510 U.S. 471, 484-86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); 5) a prisoner’s Eighth Amendment-based suit against a private corporation managing a federal prison, Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 73-74, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001); 6) landowners’ claims that government officials unconstitutionally interfered with their property rights, Wilkie, 551 U.S. at 554-61, 127 S.Ct. 2588; and 7) a prisoner’s Eighth Amendment claim against private prison employees, Minneci v. Pollard, — U.S. -, 132 S.Ct. 617, 623-26, 181 L.Ed.2d 606 (2012).
We, too, have tread carefully before recognizing Bivens causes of action when plaintiffs have invoked them in new contexts, especially in cases within the national security arena. In Wilson v. Libby, 535 F.3d 697 (D.C.Cir.2008), we declined to recognize a Bivens action for a Central Intelligence Agency operative and her husband to recover damages for injuries they allegedly suffered when her covert status was disclosed. We held that the Privacy Act’s comprehensive remedial scheme was a “special factor” counseling hesitation before creating a Bivens remedy. Id. at 706-07. We also noted that, “if we were to create a Bivens remedy, the litigation ... would inevitably require judicial intrusion into matters of national security and sensitive intelligence information.” Id. at 710. In Ali v. Rumsfeld, 649 F.3d 762 (D.C.Cir.2011), we were asked to recognize a Bivens action by noncitizen plaintiffs suing the former Secretary of Defense and three high-ranking Army officers for formulating *422 and implementing policies that allegedly caused the torture and degrading treatment of plaintiffs. We disavowed the availability of Bivens because special factors, such as the “danger of obstructing U.S. national security policy,” counseled hesitation. Id. at 773 (quoting Rasul v. Myers, 563 F.3d 527, 532 n. 5 (D.C.Cir.2009)). In Doe, we refused to create a Bivens action for a contractor, a U.S. citizen, who claimed the U.S. military wrongfully detained him in Iraq. We noted that recognizing a Bivens cause of action “is not something to be undertaken lightly,” and we again found national security was a special factor counseling serious hesitation. 683 F.3d at 394.
Other circuits have also refrained from recognizing Bivens causes of action in the national security context. The Second Circuit, sitting en banc, concluded a dual citizen of Canada and Syria could not bring a Bivens action for a claim that the United States transferred him to Syria in order to subject him to torture and interrogation. See Arar v. Ashcroft, 585 F.3d 559 (2d Cir.2009). The Fourth Circuit refused to recognize a Bivens action for plaintiff Jose Padilla, who sued former high-level policy-makers in the Department of Defense based on his status as an enemy combatant. See Lebron v. Rumsfeld, 670 F.3d 540 (4th Cir.2012). And the Seventh Circuit, sitting en banc, rejected the availability of Bivens for American citizen plaintiffs claiming they had been subjected to interrogation and mistreatment while in military detention. See Vance v. Rumsfeld, 701 F.3d 193 (7th Cir.2012). In each of these decisions, courts recognized that cases involving national security and the military counseled hesitation in recognizing a Bivens cause of action where Congress has not done so. See id. at 199-200; Lebron, 670 F.3d at 548-49; Arar, 585 F.3d at 575-76.
B
Meshal asks us to paddle upstream against this deep current of authority. He contends his suit involves only core Bivens claims — Fourth and Fifth Amendment claims made against particular law enforcement officers for actions taken during a criminal investigation — so there is nothing new here. Conversely, the government contends this case implicates a new Bivens context for two reasons: (i) Meshal’s claims involve alleged conduct undertaken as part of the FBI’s counter-terrorism responsibilities involving a national security invéstigation of terrorist activity: and (ii) the alleged acts of the federal officers occurred abroad.
We begin with some caveats. As we understand it, the Supreme Court has taken a case-by-case approach in determining whether to recognize a Bivens cause of action. See Wilkie, 551 U.S. at 550, 554, 127 S.Ct. 2588; Anya Bernstein, Congressional Will and the Role of the Executive in Bivens Actions: What Is Special About Special Factors? 45 IND. L. REV. 719, 720 (2012). We therefore need not decide, categorically, whether a Bivens action can lie against federal law enforcement officials conducting non-terrorism criminal investigations against American citizens abroad. Nor do we decide whether a Bivens action is available for plaintiffs claiming wrongdoing committed by federal law enforcement officers during a terrorism investigation occurring within the United States. Our holding is context specific.[4]
*423 Because of the procedural posture, we must reject the government’s characterization that this case involved only a national security investigation, as distinct from an investigation that was both a national security and criminal investigation. In reviewing the grant of a motion to dismiss, we assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in the plaintiffs favor. See Doe, 683 F.3d at 391. The complaint alleges that Defendants Hersem and Higgenbotham were members of the FBI “jump team” or “fly team,” the terms for those agents sent to Africa in 2007 “to conduct law enforcement investigations.” J.A. 33. On the first day of Meshal’s interrogation in Kenya and Ethiopia, Doe 1 presented Meshal with a document and asked him to sign it, “telling [Meshal] the document notified him that he could refuse to answer any questions without a lawyer present.” J.A. 37, 60. The presence of Miranda-like waiver forms usually signifies a criminal prosecution.[5] Meshal’s experience was not unique. Kenyan authorities also arrested Daniel Maldonado, and FBI agents interrogated him in Kenya around the same time they held and interrogated Meshal. After Maldonado confessed, he pled guilty in federal district court to involvement in terrorist activities. J.A. 35-36; see Partial Tr. Prelim./Detention Hr’g, United States v. Maldonado, No. 4:07-mj-00125-1, 34-35 (S.D.Tex.2007) (Dkt. No. 17). Drawing the inferences from the complaint in Meshal’s favor, the agents’ actions suggest a erimi-nal investigation for terrorism, not purely intelligence-gathering. Even so, a criminal investigation into potential terrorism implicates some of the same special factor concerns as national security policy.
C
This case requires us to examine whether allowing a Bivens action to proceed would extend the remedy to a new context. See Iqbal, 556 U.S. at 675, 129 S.Ct. 1937; Malesko, 534 U.S. at 68, 122 S.Ct. 515; Wilkie, 551 U.S. at 575, 127 S.Ct. 2588 (Ginsburg, J., concurring in part and dissenting in part); see also Arar, 585 F.3d at 572 (“ ‘Context’ is not defined in the case law.”). The Supreme Court has never defined what constitutes a new “context” for Bivens purposes, but in reviewing the case law, some patterns emerge. First, the Court considers a Bivens claim “new” when a plaintiff invokes a constitutional amendment outside the three amendments previously approved. Compare Bivens, 403 U.S. 388, 91 S.Ct. 1999 (recognizing remedy for Fourth Amendment claims), with Bush, 462 U.S. 367, 103 S.Ct. 2404 (refusing to recognize a Bivens remedy for a First Amendment violation). But even if the plaintiff alleges the same type of constitutional violation, it does not automatically invoke the same context for Bivens purposes. Compare Passman, 442 U.S. 228, 99 S.Ct. 2264 (recognizing a Bivens remedy where plaintiff alleges employment discrimination under the Fifth Amendment’s Due Process Clause), with Schweiker, 487 U.S. 412, 108 S.Ct. 2460 *424 (rejecting the availability of a Bivens remedy for social security claimants alleging a violation of due process under the Fifth Amendment). In addition, the Court considers a Bivens claim “new” when it involves a new. category of defendants. See Minneci, 132 S.Ct. 617 (private prison employee); Malesko, 534 U.S. 61, 122 S.Ct. 515 (private prison corporation); Meyer, 510 U.S. 471, 114 S.Ct. 996 (federal agency); Chappell, 462 U.S. 296, 103 S.Ct. 2362 (military defendants).
Meshal is correct that the claims here do not involve a different constitutional amendment or a new category of defendants. See Engel v. Buchan, 710 F.3d 698, 708 (7th Cir.2013) (noting the case involved an FBI agent “accused of violating the constitutional rights of a person targeted for a criminal investigation and prosecution,” and noting those facts “parallel ] Bivens itself’). Amd Meshal correctly notes that Bivens remedies typically are available when based on actions taken by law enforcement officers during criminal proceedings. See Sutton v. United States, 819 F.2d 1289, 1293 (5th Cir.1987) (acknowledging “the classic Biueres-style tort, in which a federal law enforcement officer uses excessive force, contrary to the Constitution or agency guidelines”). Yet viewed “[a]t a sufficiently high level of generality, any claim can be analogized to some other claim for which a Bivens action is afforded, just as at a sufficiently high level of particularity, every case has points of distinction.” Arar, 585 F.3d at 572. Like the Second Circuit in Arar, we construe “context” as it is commonly used in law: “to reflect a potentially recurring scenario that has similar legal and factual components.” Id.
’ The context of this case is a potential damages remedy for alleged actions occurring in a terrorism investigation conducted overseas by federal law enforcement officers. Not only does Meshal’s claim involve new circumstances — a criminal terrorism investigation conducted abroad — it also involves different legal components— the extraterritorial application of constitutional protections. Such a different context requires us to think anew. To our knowledge, no court has previously extended Bivens to cases involving either the extraterritorial application of constitutional protections[6] or in the national security domain,[7] let alone a case implicating *425 both- — another signal that this context is a novel one.
Meshal downplays the extraterritorial aspect of this case. But the extraterritorial aspect of the case is critical. After all, the presumption against extraterritoriality is a settled principle that the Supreme Court applies even in considering statutory remedies. See, e.g., Kiobel v. Royal Dutch Petroleum Co., — U.S. -, 133 S.Ct. 1659, 1664, 185 L.Ed.2d 671 (2013); Morrison v. National Australia Bank Ltd., 561 U.S. 247, 130 S.Ct. 2869, 2877, 177 L.Ed.2d 535 (2010). If. Congress had enacted a general tort cause of action applicable to Fourth Amendment violations committed by federal officers (a statutory Bivens, so to speak), that cause of action would not apply to torts committed by federal officers abroad absent sufficient indication that Congress meant the statute to apply extraterritorially. See Morrison, 130 S.Ct. at 2877. Whether the reason for reticence is concern for our sovereignty or respect for other states, extraterritoriality dictates constraint in the absence of clear congressional action.
D
Once we identify a new context, the decision whether to recognize a Bivens remedy requires us to first consider whether an alternative remedial scheme is available and next determine whether special factors counsel hesitation in creating a Bivens remedy. See Wilkie, 551 U.S. at 550, 127 S.Ct. 2588.
Meshal has no alternative remedy; the government does not claim otherwise. See Meshal, 47 F.Supp.3d at 122 (“The parties agree that Mr. Meshal has no alternative remedy for his constitutional claims.”). Meshal, backed by a number of law professors appearing as amici curiae,’ argues that, when the choice is between damages or nothing, a Bivens cause of action must lie. The Supreme Court, however, has repeatedly held that “even in the absence of an alternative” remedy, courts should not afford Bivens remedies if “any special factors counsel[ ] hesitation.” Wilkie, 551 U.S. at 550, 127 S.Ct. 2588; see also Schweiker, 487 U.S. at 421-22, 108 S.Ct. 2460. Cf. Wilson, 535 F.3d at 708-09. Put differently, even if the choice is between Bivens or nothing, if special factors counsel hesitation, the answer may be nothing. See Andrew Kent, Are Damages Different?: Bivens and National Security, 87 S. CAL. L. REV. 1123, 1151 (2014) (“Kent”) (noting “the Court’s Bivens doctrine has long tolerated denying Bivens even when there is no other effective remedy”).
The “special factors” counseling hesitation in recognizing a common law damages action “relate not to the merits of the particular remedy, but to the question of who should decide whether such a remedy should be provided.” Sanchez-Espinoza v. Reagan, 770 F.2d 202, 208 (D.C.Cir.1985) (Scalia, J.). Where an issue “involves a host of considerations that must be weighed and appraised,” its resolution “is more appropriately for those who-write the laws, rather than for those who interpret them.” Bush, 462 U.S. at 380, 103 S.Ct. 2404.
Two special factors are present in this case. • We do not here decide whether either factor alone would preclude a Bivens remedy, but both factors together do so. First, special factors counseling hesitation have foreclosed Bivens remedies in cases “involving the military, national secu *426 rity, or 'intelligence.” Doe, 683 F.3d at 394. Second, the Supreme Court has never “created or even favorably mentioned a non-statutory right of action for damages on account of conduct that occurred outside the borders of the United States.” Vance, 701 F.3d at 198-99.
Adding to the general reticence of courts in cases involving national security and foreign policy, the government offers a laundry list of sensitive issues they say would be implicated by a Bivens remedy. Further litigation, the government claims, would involve judicial inquiry into “national security threats in the Horn of Africa region,” the “substance and sources of intelligence,” and whether procedures relating to counterterrorism investigations abroad “were correctly applied.” Br. for the Appellees at 25-26, Meshal v. Higgenbotham, No. 14-5194, 2015 WL 661324 (D.C.Cir. Feb. 13, 2015). The government also alleges Bivens litigation would require discovery “from both foreign counterter-rorism officials, and U.S. intelligence officials up and down the chain of command, as well as evidence concerning the conditions at alleged detention locations in Ethiopia, Somalia, and Kenya.” Id. at 26.
Unlike other cases where a plaintiff challenges U.S. policy, the plaintiff here challenges only the individual actions of federal law enforcement officers. At oral argument, the government had few concrete answers concerning what sensitive information might be revealed if the litigation continued. Oral Arg. Recording 28:00-28:22; 29:52-29:59; 36:47-37:10. Why would an inquiry into whether the Defendants threatened Meshal with torture or death require discovery from U.S. intelligence officials up and down the chain of command? Why would an inquiry into Meshal’s allegedly unlawful detention without a judicial hearing reveal the substance or source of intelligence gathered in the Horn of Africa? What would make it necessary for the government to identify other national security threats? Neither party knows exactly what discovery will entail because no similar Bivens claim has survived the motion to dismiss stage. Still, to some extent, the unknown itself is reason for caution in areas involving national security and foreign policy — where courts have traditionally been loath to create a Bivens remedy.
At the end of the day, we find the absence of any Bivens remedy in similar circumstances highly probative. Matters touching on national security and foreign policy fall within an area of executive action where courts hesitate to intrude absent congressional authorization. See Dep’t of Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). Thus, if there is to be a judicial inquiry — in the absence of congressional authorization — in a case involving both the national security and foreign policy arenas, “it will raise concerns for the separation of powers in trenching on matters committed to the other branches.” Christopher v. Harbury, 536 U.S. 403, 417, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002). The weight of authority against expanding Bivens,[8] combined with our recognition that tort remedies in cases involving matters of national security and foreign policy are generally left to the *427 political branches, counsels serious hesitation before recognizing a common law remedy in these circumstances.
There are also practical factors counseling hesitation. One of the questions raised by Meshal’s suit is the extent to which Defendants orchestrated his detention in foreign countries. The judiciary is generally not suited to “second-guess” executive officials operating in “foreign justice systems.” Munaf v. Geren, 553 U.S. 674, 702, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008). And judicial intrusion into those decisions could have diplomatic consequences. See Br. for the Appellees at 26 (allowing Bivens here would expose “the substance of diplomatic and confidential communications between the United States and foreign governments” regarding joint terrorism investigations). Moreover, allowing Bivens suits involving both national security and foreign policy areas will “subject the government to litigation and potential law declaration it will be unable to moot by conceding individual relief, and force courts to make difficult determinations about whether and how constitutional rights should apply abroad and outside the ordinary peacetime contexts for which they were developed.” Kent, at 1173. Even if the expansion of Bivens would not impose “the sovereign will of the United States onto conduct by foreign officials in a foreign land,” Dissent at 18, the actual repercussions are impossible to parse. We cannot forecast how the spectre of litigation and the potential discovery of sensitive information might affect the enthusiasm of foreign states to cooperate in joint actions or the government’s ability to keep foreign policy commitments or protect intelligence. Just as the special needs of the military requires courts to leave the creation of damage remedies against military officers to Congress, so the special needs of foreign affairs combined with national security “must stay our hand in the creation of damage remedies.” Sanchez-Espinoza, 770 F.2d at 208-09.
Ill
A
Meshal claims his U.S. citizenship outweighs the national security and foreign policy sensitivities implicated by permitting a Bivens claim. We are not unsympathetic. American citizenship has inherent value. See Tuaua v. United States, No. 13-5272, slip op. at 14 (D.C.Cir. June 5, 2015) (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 160, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). Even so, the “source of'hesitation” in the Bivens special factor analysis “is the nature of the suit and the consequences flowing from it, not just the identity of the plaintiff.” Lebron, 670 F.3d at 554; see also Vance, 701 F.3d at 203. At no point has the Supreme Court intimated that citizenship trumps other special factors counseling hesitation in creating a Bivens remedy.
B
Meshal, and several law professors as amici, claim two congressional actions amounted to statutory ratification of Bivens. They further claim courts have consistently misinterpreted these legislative actions, and, consequently, have taken an unduly narrow view of Bivens.
In 1973, Congress rejected a Department of Justice proposal to substitute the federal government as the defendant in all intentional tort suits against federal officers, including those raising constitutional claims, as part of the Federal Tort Claims Act. See James E. Pfander & David Balt-manis, Rethinking Bivens: Legitimacy and Constitutional Adjudication, 98 GEO. L.J. 117, 131 & n. 79 (2009) (“Pfander & *428 Baltmanis”); see also S. REP. NO. 93-588, at 3 (1973). In 1988 Congress again rejected a DOJ proposal to funnel all liability into claims brought against the government rather than individual federal officers. See Pfander & Baltmanis, at 135 n. 100; Carlos M. Vázquez & Stephen I. Vla-deck, State Law, the Westfall Act, and the Nature of the Bivens Question, 161 U. Pa. L.Rev. 509, 566-70 (2013) (‘Vázquez & Vla-deck”). Congress instead passed the Westfall Act, providing that the FTCA would be the exclusive remedy for federal officials sued for “scope-of-employment” torts. Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub.L. No. 100-694, § 5, 102 Stat. 4563, 4564 (codified at 28 U.S.C. § 2679(b)). In addition to creating detailed procedures for converting state torts claims against individual officers into FTCA claims against the United States, the Westfall Act provided an exception to the exclusive-remedy provision, stating it would not “extend or apply to a civil action ... which is brought for a violation of the Constitution of the United States.” 28 U.S.C. § 2679(b)(2)(A). Thus, Congress expressly granted an exemption from the FTCA for Bivens suits. See Hui v. Castaneda, 559 U.S. 799, 807, 130 S.Ct. 1845, 176 L.Ed.2d 703 (2010) (“Notably, Congress also provided an exception for constitutional violations.”); H.R. Rep. 100-700, at 6, 1988 U.S.C.C.A.N. 5945, 5950 (“Since the Supreme Court’s decision in [Bivens ], the courts have identified [a constitutional] tort as a more serious intrusion of the rights of an individual that merits special attention. Consequently, [the Westfall Act] would not affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights.”).
But whether Congress, in rejecting Justice Department proposals and providing a FTCA exemption, meant to ratify Bivens is open to doubt. Congress may have viewed Bivens and federal tort claims as “parallel, complementary causes of action,” Carlson, 446 U.S. at 20, 100 S.Ct. 1468, and intended, through the Westfall Act, to “solidify the Bivens remedy,” Pfan-der & Baltmanis, at 121-22. Or Congress could have thought “Bivens was a constitutionally required decision,” Carlson, 446 U.S. at 33 n. 2, 100 S.Ct. 1468 (Rehnquist, J., dissenting), thus believing it could not legislate away Bivens remedies. We normally presume Congress legislates consistently with constitutional commands, see United States v. X-Citement Video, Inc., 513 U.S. 64, 73, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994), so mere congressional acquiescence to Bivens may not be the same as congressional ratification. And even if Congress did somehow ratify Bivens,[9] we would be left with yet another question: Did Congress intend to ratify Bivens’ scope as it was in 1988 or more broadly? See Vázquez & Vladeck, at 579. If Congress intended to ratify Bivens only as it existed in 1988 then this would be an easy case.
There are no definitive answers to these competing visions of congressional action. We are not foreclosing either interpretation, but in a case where the thumb is heavy on the scale against recognizing a Bivens remedy, uncertain interpretations of what Congress did in 1973 and 1988 cannot overcome the weight of authority against expanding Bivens. In any event, *429 if the courts, as amici argue, have radically misunderstood the nature and scope of Bivens remedies, a course correction must come from the Supreme Court, which has repeatedly rejected calls for a broad application of Bivens. See supra, at Part IIC. Because we follow its lead, we will ship our oars until that Court decides the scope of the remedy it created.
If people like Meshal are to have recourse to damages for alleged constitutional violations committed during a terrorism investigation occurring abroad, either Congress or the Supreme Court must specify the scope of the remedy.
IV
Because Meshal has not stated a valid cause of action, the judgment of dismissal is

Affirmed.

. When reviewing whether the district court properly granted a motion to dismiss, we as *419 sume the truth of all well-pleaded factual allegations in the complaint. Doe v. Rumsfeld, 683 F.3d 390, 391 (D.C.Cir.2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

. See Midnight Express (Columbia Pictures 1978).

. Meshal pled additional Fifth Amendment claims that the district court did not address. Those claims related to his "prolonged extrajudicial detention and his forcible rendition to two dangerous situations.” Br. of Appellant at 20 n. 4, Meshal v. Higgenbotham, No. 14-5194 (D.C.Cir. Dec. 15, 2014). We need not discuss these additional claims, which were raised only in a footnote in Meshal’s initial brief. See Hutchins v. District of Columbia, 188 F.3d 531, 539 n. 3 (D.C.Cir.1999).

. Nor do we question whether constitutional protections generally apply to American citizens outside the United States when dealing with their government. See Reid v. Covert, 354 U.S. 1, 6-10, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (applying Fifth and Sixth Amendment rights to U.S. citizens facing military trial for murder overseas); Al Bahlul v. Unit *423 ed States, 767 F.3d 1, 65 n. 3 (D.C.Cir.2014) (Kavanaugh, J., concurring in part) ("As a general matter, the U.S. Constitution applies to U.S. citizens worldwide[.]”).

. See FeiFei Jiang, Dancing the Two-Step Abroad: Finding A Place for Clean Team Evidence in Article III Courts, 47 COLUM. J.L. & SOC. PROBS. 453, 453 (2014) ("Federal agents often employ a two-step interview process for suspects in extraterritorial terrorism investigations. Agents conduct the first interview without Miranda warnings for the purpose of intelligence-gathering. Separate 'clean team’ agents then give the suspect Miranda warnings prior to the second stage of the interview, which they conduct for law enforcement purposes.”).

. We considered a Bivens claim involving actions occurring overseas in In re Sealed Case, 494 F.3d 139 (D.C.Cir.2007). There, a Drug Enforcement Agency officer stationed in Burma alleged a State Department official violated his Fourth Amendment rights when the official sent a classified cable transcribing a telephone call plaintiff had made to a subordinate. Id. at 141. In response, the government invoked the state secrets doctrine, which, when the district court applied the doctrine, essentially barred plaintiff's Bivens claim. • On appeal, we noted the government had not challenged the application of the Fourth Amendment to actions occurring overseas, and we assumed, without analysis, Bivens applied. Id. at 143 (“The district court ruled that it was settled, indisputable law that the Fourth Amendment protects American citizens abroad, ... and the United States does not challenge that ruling on appeal.”). Consequently, In re Sealed Case did not establish that Bivens is available for all claims involving incidents occurring abroad.

. Neither Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), nor Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011), help Meshal’s cause. Although both cases involved Bivens claims in the national security context, in neither case did the Court explicitly consider whether to imply a Bivens cause of action. The Court instead, as has become its practice in some Bivens cases, seemed to assume without deciding that the claims were actionable under Bivens. See, e.g., Wood v. Moss, - U.S.-, 134 S.Ct. 2056, 2066, 188 L.Ed.2d 1039 (2014) (assuming without deciding Bivens applied to a First Amendment viewpoint discrimination claim); Reichle v. Howards, *425 -U.S.-, 132 S.Ct. 2088, 2093 n. 4, 182 L.Ed.2d 985 (2012) (same for First Amendment retaliatory arrest claim); Iqbal, 556 U.S. at 675, 129 S.Ct. 1937 (same for First Amendment free exercise claim). Moreover, neither case involved extraterritoriality.

. Even one of Meshal’s amici suggests that our prior' decisions saying no to Bivens in cases involving national security prevents the panel from creating a Bivens action here. See Steve Vladeck, Meshal: The Last, Best Hope for National Security Bivens Claims?, Just Security (June. 17, 2014, 4:09 PM), http:// justsecurity.org-/11784/meshal (“Of course, that these three circuit-level decisions (especially the D.C. Circuit’s decision in Doe) compel the result in the district court in Meshal says nothing about whether the en banc D.C. Circuit or Supreme Court would necessarily agree.”).

. If Congress really desired a ratification of Bivens, its actions were not a model of clarity. Congress did not place Bivens causes of action in a separate statutory provision as it did for federal questions and constitutional violations committed by state actors. See 28 U.S.C. § 1331; 42 U.S.C. § 1983. Instead, it merely created an exception to FTCA immunity for constitutional violations. See 28 U.S.C. § 2679(b)(2)(A).