# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 12-50217

————

United States Court of Appeals
Fifth Circuit

**FILED**

March 20, 2018

Lyle W. Cayce
Clerk

JESUS C. HERNANDEZ, Individually and as the surviving father of Sergio Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio Adrian Hernandez Guereca; MARIA GUADALUPE GUERECA BENTACOUR, Individually and as the surviving mother of Sergio Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio Adrian Hernandez,

Plaintiffs - Appellants

v.

JESUS MESA, JR.,

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas

**ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES**

Before STEWART, Chief Judge, and JOLLY, DAVIS, JONES, SMITH, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, and COSTA, Circuit Judges.*

---

 * Judges Jolly and Davis, now Senior Judges of this court, participated in the consideration of this en banc case. Judges Willett and Ho joined the court after this case was submitted and did not participate in the decision.

No. 12-50217

EDITH H. JONES, Circuit Judge, joined by STEWART, Chief Judge, JOLLY, DAVIS, SMITH, DENNIS,** CLEMENT, OWEN, ELROD, SOUTHWICK, HAYNES,*** HIGGINSON, and COSTA, Circuit Judges.

This appeal returned to the court en banc following remand from the United States Supreme Court.  Prompted by the High Court, we have carefully considered a question antecedent to the merits of the Hernandez family's claims against United States Customs & Border Patrol Agent Mesa:  whether federal courts have the authority to craft an implied damages action for alleged constitutional violations in this case.  *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971) [hereinafter *Bivens*].  We hold that this is not a garden variety excessive force case against a federal law enforcement officer.  The transnational aspect of the facts presents a "new context" under *Bivens*, and numerous "special factors" counsel against federal courts' interference with the Executive and Legislative branches of the federal government.

## BACKGROUND

Because the plaintiffs' claims were dismissed on the pleadings, the alleged facts underlying this tragic event are taken as true.  Fed. R. Civ. P. 12(b)(6); *Toy v. Holder*, 714 F.3d 881, 883 (5th Cir. 2013).  Sergio Hernandez was a 15-year-old Mexican citizen without family in, or other ties to, the United States.  On June 7, 2010, while at play, he had taken a position on the Mexican side of a culvert that marks the boundary between Ciudad Juarez, Mexico, and El Paso, Texas.  The FBI reported that Agent Mesa was engaged in his law enforcement duties when a group of young men began throwing rocks at him

---

** Judge Dennis concurs in the judgment.

*** Judge Haynes concurs in the judgment and with the majority opinion's conclusion that *Bivens* should not extend to the circumstances of this case.

No. 12-50217

from the Mexican side of the border. From United States soil, the agent fired several shots toward the assailants. Hernandez was fatally wounded.

Hernandez's parents alleged numerous claims in a federal lawsuit against Agent Mesa, other Border Patrol officials, several federal agencies, and the United States government. The federal district court dismissed all claims, but was reversed in part by a divided panel of this court. *Hernandez v. United States*, 757 F.3d 249, 255 (5th Cir. 2014). The panel decision allowed only a *Bivens* claim, predicated on Fifth Amendment substantive due process, to proceed against Agent Mesa alone. *Id.* at 277. This court elected to rehear the appeal en banc. Without ruling on the cognizability of a *Bivens* claim in the first instance,[1] we concluded unanimously that the plaintiffs' claim under the Fourth Amendment failed on the merits and that Agent Mesa was shielded by qualified immunity from any claim under the Fifth Amendment. We rejected the plaintiffs' remaining claims. *See Hernandez v. Mesa*, 785 F.3d 117, 119 (5th Cir. 2015) (en banc).

The Supreme Court granted certioriari and heard this case in conjunction with *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). In *Abbasi*, the Court reversed the Second Circuit and refused to imply a *Bivens* claim against policymaking officials involved in terror suspect detentions following the 9/11 attacks. The Court, however, remanded for reconsideration by the appeals court whether a *Bivens* claim might still be maintained against a prison warden.

The Court's decision in this case tagged onto *Abbasi* by rejecting this court's approach and ordering a remand for us to consider the propriety of

---

[1] *See Hernandez v. United States*, 785 F.3d 117, 128-33 (5th Cir. 2015) (en banc) (Jones, J., concurring).

3

allowing *Bivens* claims to proceed on behalf of the Hernandez family in light of *Abbasi*'s analysis.

## DISCUSSION

The plaintiffs assert that Agent Mesa used deadly force without justification against Sergio Hernandez, violating the Fourth and Fifth Amendments, where the fatal shot was fired across the international border. No federal statute authorizes a damages action by a foreign citizen injured on foreign soil by a federal law enforcement officer under these circumstances. Thus, plaintiffs' recovery of damages is possible only if the federal courts approve a *Bivens* implied cause of action. *Abbasi* instructs us to determine initially whether these circumstances present a "new context" for *Bivens* purposes, and if so, whether "special factors" counsel against implying a damages claim against an individual federal officer. To make these determinations, we review *Abbasi*'s pertinent discussion about "*Bivens* and the ensuing cases in [the Supreme Court] defining the reach and the limits of that precedent." *Abbasi*, 137 S. Ct. at 1854.

In *Abbasi*, the Court begins by explaining that when Congress passed what is now 42 U.S.C. § 1983 in 1871, it enacted no comparable law authorizing damage suits in federal court to remedy constitutional violations by federal government agents. In 1971, the *Bivens* decision broke new ground by authorizing such a suit for Fourth Amendment violations by federal law enforcement officers who handcuffed and arrested an individual in his own home without probable cause. Within a decade, the Court followed up by allowing a *Bivens* action for employment discrimination, violating equal protection under the Fifth Amendment, against a Congressman.[2] The Court

---

[2] *Davis v. Passman*, 442 U.S. 228, 99 S. Ct. 2264 (1979).

4

No. 12-50217

soon after approved a *Bivens* claim for constitutionally inadequate inmate medical care, violating the Eighth Amendment, against federal jailers.[3] According to the Court in *Abbasi*, these three cases coincided with the "*ancien regime*"[4] in which "the Court followed a different approach to recognizing implied causes of action than it follows now." *Abbasi*, 137 S. Ct. at 1855.

The "*ancien regime*" was toppled step by step as the Court, starting in the late 1970s, retreated from judicially implied causes of action[5] and cautioned that where Congress "intends private litigants to have a cause of action," the "far better course" is for Congress to confer that remedy explicitly. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717, 99 S. Ct. 1946, 1968 (1979). *Abbasi* acknowledges that the Constitution lacks as firm a basis as congressional enactments for implying causes of action; but the "central" concern in each instance arises from separation-of-powers principles. *Abbasi*, 137 S. Ct. at 1857. Consequently, the current approach renders implied *Bivens* claims a "disfavored"[6] remedy. *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S. Ct. 1937, 1948 (2009)). The Court then lists the many subsequent cases that declined to extend *Bivens* under varying circumstances and proffered constitutional violations. *Id.*

---

[3] *Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468 (1980).

[4] *Abbasi*, 137 S. Ct. at 1855 (citing *Alexander v. Sandoval*, 532 U.S. 275, 287, 121 S. Ct. 1511, 1520 (2001)).

[5] *See Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 97 S. Ct. 926 (1977); *Cort v. Ash*, 422 U.S. 66, 95 S. Ct. 2080 (1975).

[6] "Indeed," the Court states, its current approach suggests the possibility that the analysis in the three *Bivens* cases providing a damage remedy "might have been different if they were decided today." *Abbasi*, 137 S. Ct. at 1856. The dissent never acknowledges that *Bivens* claims are, post-*Abbasi,* a disfavored remedy.

*Abbasi* goes on to reiterate with an exacting description the two-part analysis for implying *Bivens* claims. We turn to the two inquiries by comparing *Abbasi*'s separation-of-powers considerations and its facts to the present case.

**A. New Context**

The plaintiffs assert that because the allegedly unprovoked shooting of a civilian by a federal police officer is a prototypical excessive force claim, their case presents no "new context" under *Bivens*. This court, including our colleagues in dissent, disagrees.[7] The fact that *Bivens* derived from an unconstitutional search and seizure claim is not determinative. The detainees in *Abbasi* asserted claims for, *inter alia*, strip searches under both the Fourth and Fifth Amendments, but the Supreme Court found a "new context" despite similarities between "the right and the mechanism of injury" involved in previous successful *Bivens* claims. *Abbasi*, 137 S. Ct. at 1859. As *Abbasi* points out, the *Malesko* case rejected a "new" *Bivens* claim under the Eighth Amendment,[8] whereas an Eighth Amendment *Bivens* claim was held cognizable in *Carlson*; and *Chappell* rejected a *Bivens* employment discrimination claim in the military,[9] although such a claim was allowed to proceed in *Davis v. Passman*. The proper inquiry is whether "the case is different in a meaningful way" from prior *Bivens* cases. *Abbasi*, 137 S. Ct. at 1859.

Among the non-exclusive examples of such "meaningful" differences, the Court points to the constitutional right at issue, the extent of judicial guidance

---

[7] Although the dissent purports to agree this is a "new context" for *Bivens* purposes, most of its reasoning about "special factors" asserts, contradictorily, that this case is "no different" than *Bivens* suits against federal law enforcement officers in wholly domestic cases.

[8] *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 122 S. Ct. 515 (2001).

[9] *Chappell v. Wallace*, 462 U.S. 296, 103 S. Ct. 2362 (1983).

as to how an officer should respond, and the risk of the judiciary's disruptive intrusion into the functioning of the federal government's co-equal branches. *Abbasi*, 137 S. Ct. at 1860-61. The Court found it an easy conclusion that there were meaningful differences between prior *Bivens* claims and claims alleged in *Abbasi* for unconstitutional "confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil." *Id.* at 1860. Even more significant, the Court decided that claims against the prison warden for "compelling" allegations of detainee abuse and prison regulation violations also arose in a "new context" under *Bivens*. *Id.* at 1864. Despite close parallels between claims alleged against the warden and *Carlson*, the Court explained that "even a modest extension [of *Bivens*] is still an extension," *id.*, and the Court remanded for additional consideration of the "special factors."

Pursuant to *Abbasi*, the cross-border shooting at issue here must present a "new context" for a *Bivens* claim. Because Hernandez was a Mexican citizen with no ties to this country, and his death occurred on Mexican soil, the very existence of any "constitutional" right benefitting him raises novel and disputed issues. There has been no direct judicial guidance concerning the extraterritorial scope of the Constitution and its potential application to foreign citizens on foreign soil.[10] To date, the Supreme Court has refused to extend the protection of the Fourth Amendment to a foreign citizen residing in the United States against American law enforcement agents' search of his premises in Mexico. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 110 S. Ct. 1056 (1990).[11] Language in *Verdugo*'s majority opinion strongly

---

[10] We will consider the potential intrusion on the Executive and Legislative branches in detail in the next section of this opinion.

[11] *See also Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S. Ct. 2491, 2500 (2001) ("It is well established that certain constitutional protections available to persons inside the United

suggests that the Fourth Amendment does not apply to American officers' actions outside this country's borders. *See Verdugo-Urquidez*, 494 U.S. at 274-75, 110 S. Ct. at 1066. In *Hernandez*, the Supreme Court itself described the plaintiffs' Fourth Amendment claims as raising "sensitive" issues. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017).

Likewise, the plaintiffs can prevail on a substantive due process Fifth Amendment claim only if federal courts accept two novel theories. The first would allow a *Bivens* action to proceed based upon a Fifth Amendment excessive force claim simply because *Verdugo* might prevent the assertion of a comparable Fourth Amendment claim. *But cf. Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989) ("[*A*]*ll* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). The second theory would require the extension of the *Boumediene* decision,[12] both beyond its explicit constitutional basis, Art. I, § 9, cl. 2, the Habeas Corpus Suspension Clause, and beyond the United States government's *de facto* control of the territory surrounding the Guantanamo Bay detention facility. *See Boumediene*, 553 U.S. at 771, 128 S. Ct. at 2262 ("The detainees, moreover, are held in a territory that, while technically not part of the United States, is under the *complete and total control* of our Government.") (emphasis added). Moreover, even nine years later, no federal circuit court has extended the holding of *Boumediene* either

---

States are unavailable to aliens outside of our geographic borders.") (citing *Verdugo-Urquidez*, 494 U.S. at 269, 110 S. Ct. at 1063; *Johnson v. Eisentrager*, 339 U.S. 763, 784, 70 S. Ct. 936, 947 (1950)).

[12] *Boumediene v. Bush*, 553 U.S. 723, 128 S. Ct. 2229 (2008).

substantively to other constitutional provisions or geographically to locales where the United States has neither *de facto* nor *de jure* control. Indeed, the courts have unanimously rejected such extensions.[13]

The plaintiffs assert that because this is just a case in which one rogue law enforcement officer engaged in misconduct on the operational level, it poses no "new context" for *Bivens* purposes. On the contrary, their unprecedented claims embody not merely a "modest extension"—which *Abbasi* describes as a "new" *Bivens* context—but a virtual repudiation of the Court's holding. *Abbasi* is grounded in the conclusion that *Bivens* claims are now a distinctly "disfavored" remedy and are subject to strict limitations arising from the constitutional imperative of the separation of powers. The newness of this "new context" should alone require dismissal of the plaintiffs' damage claims. Nevertheless, we turn next to the "special factors" analysis assuming arguendo that some type of constitutional claims could be conjured here.

## B. Special Factors

The plaintiffs argue that this case involves no "special factors"—no reasons the court should hesitate before extending *Bivens*. However

---

[13] *Bahlul v. United States*, 840 F.3d 757, 796 (D.C. Cir. 2016) (en banc) (Millett, J., concurring) ("That holding, however, was 'explicitly confined [] 'only' to the extraterritorial reach of the Suspension Clause,' and expressly 'disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause.'" (quoting *Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009) (quoting *Boumediene*, 553 U.S. at 795, 128 S. Ct. at 2275-76))), *cert. denied*, 138 S. Ct. 313 (2017); *Al Bahlul v. United States*, 767 F.3d 1, 33 (D.C. Cir. 2014) (en banc) (Henderson, J., concurring) ("Whether *Boumediene* in fact portends a sea change in the extraterritorial application of the Constitution writ large, we are bound to take the Supreme Court at its word when it limits its holding to the Suspension Clause." (citations omitted)); *Ali v. Rumsfeld*, 649 F.3d 762, 771 (D.C. Cir. 2011) ("[The Court] explicitly confined its constitutional holding 'only' to the extraterritorial reach of the Suspension Clause and disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause." (citations omitted)); *Igartúa v. United States*, 626 F.3d 592, 600 (1st Cir. 2010) ("The *Boumediene* court was concerned only with the Suspension Clause . . . not with . . . any other constitutional text.").

remarkable this position may seem, it is unremarkable that the plaintiffs hold it. Indeed, they must. The presence of "special factors" precludes a *Bivens* extension. Given *Abbasi*'s elucidation of the "special factors" inquiry, there is more than enough reason for this court to stay its hand and deny the extraordinary remedy that the plaintiffs seek.

*Abbasi* clarifies the concept of "special factors" by explicitly focusing the inquiry on maintaining the separation of powers: "separation-of-powers principles are or should be central to the analysis." *Abbasi*, 137 S. Ct. at 1857. Before *Abbasi*, the Court had instructed lower courts to perform "the kind of remedial determination that is appropriate for *a common-law tribunal.*" *See, e.g.*, *Wilkie v. Robbins*, 551 U.S. 537, 550, 127 S. Ct. 2588, 2598 (2007) (emphasis added) (quoting *Bush v. Lucas*, 462 U.S. 367, 378, 103 S. Ct. 2404, 2411 (1983)). Underscoring the Court's steady retreat from the "*ancien regime*" discussed above, that language appears nowhere in *Abbasi*. Instead, *Abbasi* instructs courts to "concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857-58. In light of this guidance, the question for this court is not whether this case is distinguishable from *Abbasi* itself—it certainly is—but whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy." *Id.* at 1858. If such reasons exist, "the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id.*

Applying *Abbasi*'s separation-of-powers analysis reveals numerous "special factors" at issue in this case. To begin with, this extension of *Bivens* threatens the political branches' supervision of national security. "The Supreme Court has never implied a *Bivens* remedy in a case involving the

military, national security, or intelligence." *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012). In *Abbasi*, the Court stressed that "[n]ational-security policy is the prerogative of the Congress and the President." *Abbasi*, 137 S. Ct. at 1861. The plaintiffs note the Court's warning that "national security" should not "become a talisman used to ward off inconvenient claims." *Id.* at 1862. But the Court stated that "[t]his danger of abuse" is particularly relevant in "domestic cases." *See id.* (citations omitted). Of course, the defining characteristic of this case is that it is *not* domestic. National-security concerns are hardly "talismanic" where, as here, border security is at issue. *See, e.g.*, *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) ("[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States.").

In particular, the threat of *Bivens* liability could undermine the Border Patrol's ability to perform duties essential to national security. Congress has expressly charged the Border Patrol with "deter[ring] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband." 6 U.S.C. § 211(e)(3)(B). Although members of the Border Patrol like Agent Mesa may conduct activities analogous to domestic law enforcement, this case involved shots fired across the border within the scope of Agent Mesa's employment.[14] In a similar context—airport security—the Third Circuit recently denied a *Bivens* remedy for a TSA agent's alleged constitutional

---

[14] Given the transnational context of this case, denying a remedy here does not, as the plaintiffs suggest, repudiate *Bivens* claims where constitutional violations by the Border Patrol are wholly domestic. *See, e.g.*, *De La Paz v. Coy*, 786 F.3d 367, 374 (5th Cir. 2015) (deferring to prior Fifth Circuit decisions "to the extent that they permit *Bivens* actions against immigration officers who deploy unconstitutionally excessive force when detaining immigrants on American soil").

violations. *Vanderklok v. United States*, 868 F.3d 189, 207-209 (3d Cir. 2017). Relying on *Abbasi*, the Third Circuit's analysis is instructive:

> [The plaintiff] asks us to imply a *Bivens* action for damages against a TSA agent. TSA employees [ ] are tasked with assisting in a critical aspect of national security—securing our nation's airports and air traffic. The threat of damages liability could indeed increase the probability that a TSA agent would hesitate in making split-second decisions about suspicious passengers. In light of Supreme Court precedent, past and very recent, that is surely a special factor that gives us pause.

*Id.* at 207. The same logic applies here.[15] Implying a private right of action for damages in this transnational context increases the likelihood that Border Patrol agents will "hesitate in making split second decisions." Considering the "systemwide" impact of this *Bivens* extension, there are "sound reasons to think Congress might doubt [its] efficacy." *Abbasi,* 137 S. Ct. at 1858.

Extending *Bivens* in this context also risks interference with foreign affairs and diplomacy more generally. This case is hardly *sui generis*: the United States government is always responsible to foreign sovereigns when federal officials injure foreign citizens on foreign soil. These are often delicate diplomatic matters, and, as such, they "are rarely proper subjects for judicial intervention." *Haig v. Agee,* 453 U.S. 280, 292, 101 S. Ct. 2766, 2774 (1981). In fact, in 2014 the United States and Mexican governments established the joint Border Violence Prevention Council as a forum for addressing these sorts of issues.[16] The incident involving Agent Mesa initiated serious dialogue

---

[15] Although the dissent contends that the *Vanderklok* court focused on the lack of TSA law enforcement training, we believe public safety was the court's overriding concern. *See Vanderklok,* 868 F.3d at 209 ("Ultimately, the role of the TSA in securing public safety is so significant that we ought not create a damages remedy in this context.").

[16] DHS, *Written Testimony for a H. Comm. on Oversight & Gov't Reform Hearing* (Sept. 9, 2015), https://www.dhs.gov/news/2015/09/09/written-testimony-dhs-southern-border-and-approaches-campaign-joint-task-force-west.

between the two sovereigns, with the United States refusing Mexico's request to extradite Mesa but resolving to "work with the Mexican government within existing mechanisms and agreements to prevent future incidents."[17]

Given the dialogue between Mexico and the United States, the plaintiffs are wrong to suggest that Mexico's support for a new *Bivens* remedy obviates foreign affairs concerns. It is not surprising that Mexico, having requested Mesa's extradition, now supports a damages remedy against him. But the Executive Branch denied extradition and refused to indict Agent Mesa following a thorough investigation.[18] It would undermine Mexico's respect for the validity of the Executive's prior determinations if, pursuant to a *Bivens* claim, a federal court entered a damages judgment against Agent Mesa. In any event, diplomatic concerns "involve[ ] a host of considerations that must be weighed and appraised"—a sign that they must be "committed to those who write the laws rather than those who interpret them." *Abbasi*, 137 S. Ct. at 1857 (citations omitted).

Congress's failure to provide a damages remedy in these circumstances is an additional factor counseling hesitation. *Abbasi* emphasized that Congress's silence may be "relevant[] and . . . telling," especially where "Congressional interest" in an issue "has been frequent and intense." *Id.* at 1862 (citations omitted). It is "much more difficult to believe that

---

[17] DOJ, *Federal Officials Close Investigation into the Death of Sergio Hernandez-Guereca* (Apr. 27, 2012), https://www.justice.gov/opa/pr/federal-officials-close-investigation-death-sergio-hernandez-guereca.

[18] *See Hernandez*, 785 F.3d at 132 (Jones, J., concurring) ("Numerous federal agencies, including the FBI, the Department of Homeland Security's Office of the Inspector General, the Justice Department's Civil Rights Division, and the United States Attorney's Office, investigated this incident and declined to indict Agent Mesa or grant extradition to Mexico under 18 U.S.C. § 3184.").

No. 12-50217

congressional inaction was inadvertent" given the increasing national policy focus on border security. *Abbasi*, 137 S. Ct. at 1862 (citations omitted).

Relevant statutes confirm that Congress's failure to provide a federal remedy was intentional. For instance, in section 1983, Congress expressly limited damage remedies to "citizen[s] of the United States or other person[s] within the jurisdiction thereof." 42 U.S.C. § 1983. Given that *Bivens* is a judicially implied version of section 1983, it would violate separation-of-powers principles if the implied remedy reached further than the express one. Likewise, under the Federal Tort Claims Act—a law that comprehensively waives federal sovereign immunity to provide damages remedies for injuries inflicted by federal employees—Congress specifically excluded "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k). Congress also exempted federal officials from liability under the Torture Victim Protection Act of 1991. *See* 28 U.S.C. §§ 2671 *et seq*.[19] Taken together, these statutes represent Congress's repeated refusals to create private rights of action against federal officials for injuries to foreign citizens on foreign soil.[20] It is not credible that Congress would favor the judicial invention of those rights.[21]

Nor, under *Abbasi*, does the plaintiffs' lack of a damages remedy favor extending *Bivens*. The Supreme Court has held that "even in the absence of

---

[19] President George H.W. Bush stressed this interpretation of the TVPA when signing the legislation. *See* Statement on Signing the Torture Victim Protection Act of 1991, Mar. 12, 1992), http://www.presidency.ucsb.edu/ws/index.php?pid=20715.

[20] Of course, there are some very narrow exceptions. *See, e.g.*, Victims of Trafficking and Violence Protection Act of 2000, 18 U.S.C. §§ 1595, 1596, 3271 (creating private right of action for noncitizens against federal employees who engage in sex trafficking outside the United States).

[21] Congress has also repeatedly authorized the payment of damages for injuries to aliens in foreign countries through limited administrative claims procedures. *See, e.g.*, 22 U.S.C. § 2669-1. The existence of such procedures is additional evidence that Congress's failure to provide a remedy in this instance is intentional.

14

an alternative" remedy, courts should not extend *Bivens* if any special factors counsel hesitation. *Wilkie*, 551 U.S. at 550, 127 S. Ct. at 2598. Thus, the *absence* of a remedy is only significant because the *presence* of one precludes a *Bivens* extension. Here, the absence of a federal remedy does not mean the absence of deterrence. *Abbasi* acknowledges the "persisting concern [ ] that absent a *Bivens* remedy there will be insufficient deterrence to prevent officers from violating the Constitution." *Abbasi*, 137 S. Ct. at 1863. For cross-border shootings like this one, however, criminal investigations and prosecutions are already a deterrent. While it is true that numerous federal agencies investigated Agent Mesa's conduct and decided not to bring charges, the DOJ is currently prosecuting another Border Patrol agent in Arizona for the cross-border murder of a Mexican citizen. *See United States v. Swartz*, No. 15-CR-1723 (D. Ariz. Sept. 23, 2015). The threat of criminal prosecution for abusive conduct is not hollow. In some instances, moreover, a state-law tort claim may be available to provide both deterrence and damages. That claim is unavailable here because the DOJ certified that Agent Mesa acted within the scope of his employment, and so the Westfall Act protects him from liability. *See* 28 U.S.C. § 2679(b)(1), (d). The plaintiffs concede that Agent Mesa was acting within the scope of his employment. Regardless, *Abbasi* makes clear that, when there is "a balance to be struck" between countervailing policy considerations like deterrence and national security, "[t]he proper balance is one for the Congress, not the Judiciary, to undertake." *Abbasi*, 137 S. Ct. at 1863.

Finally, the extraterritorial aspect of this case is itself a special factor that underlies and aggravates the separation-of-powers issues already discussed. The plaintiffs argue that extraterritoriality cannot constitute a special factor because this would multiply extraterritoriality's significance. But this misunderstands the *Bivens* inquiry and misreads Supreme Court

precedent.  The plaintiffs' argument relies on *Davis v. Passman*, in which the defendant argued that his conduct was immunized by the Speech or Debate Clause and, alternatively, that the Clause was a "special factor" for *Bivens* purposes.  The Court held that the scope of the immunity and weight of the special factor were "coextensive."  *See Davis*, 442 U.S. at 246, 99 S. Ct. at 2277.  In other words, if the Clause did not immunize the defendant's conduct, then it was not a special factor.  Similarly, the plaintiffs here suggest that extraterritoriality is not a "special factor" if the Constitution applies extraterritorially.  This argument conflates the applicability of a constitutional immunity with the scope of a constitutional right, and thereby turns the *Bivens* inquiry upside down.  *Bivens* remedies are not "coextensive" with the Constitution's protections.  Indeed, in *United States v. Stanley*, the Supreme Court rejected a similar *Davis*-based argument, finding it "not an application but a repudiation of the 'special factors' limitation."   483 U.S. 669, 686, 107 S. Ct. 3054, 3065 (1987).

Plaintiffs also suggest that relying on extraterritoriality as an indicator of a "new context" and as a "special factor" double counts the significance of extraterritoriality and stacks the deck against extending *Bivens*.  But *Abbasi* explicitly states that one rationale for finding a "new context" is "the presence of *potential special factors*."  *Abbasi*, 137 S. Ct. at 1860 (emphasis added).  To the extent that this court double counts the significance of extraterritoriality, the Supreme Court has not foreclosed our doing so.

Indeed, the novelty and uncertain scope of an extraterritorial *Bivens* remedy counsel hesitation.  As the Eleventh Circuit recently averred, the legal theory itself may constitute a special factor if it is "doctrinally novel and difficult to administer."  *Alvarez v. U.S. Immigration & Customs Enf't*, 818 F.3d 1194, 1210 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 2321 (2017).  An extraterritorial *Bivens* extension is "doctrinally novel."  The Supreme Court

No. 12-50217

"has never created or even favorably mentioned a non-statutory right of action for damages on account of conduct that occurred outside the borders of the United States." *Vance v. Rumsfeld*, 701 F.3d 193, 198-99 (7th Cir. 2012) (en banc). Nor has any court of appeals extended *Bivens* extraterritorially. *See Meshal v. Higgenbotham*, 804 F.3d 417, 424-25 (D.C. Cir. 2015), *cert. denied*, 137 S. Ct. 2325 (2017). Extraterritoriality, moreover, involves a host of administrability concerns, making it impossible to assess the "impact on governmental operations systemwide." *Abbasi*, 137 S. Ct. at 1858.[22]

But novelty is by no means the only problem with an extraterritorial *Bivens* remedy. The presumption against extraterritoriality accentuates the impropriety of extending private rights of action to aliens injured abroad. According to the Supreme Court, "[t]he presumption against extraterritorial application helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116, 133 S. Ct. 1659, 1664 (2013). Even when a statute's substantive provisions do apply extraterritorially, a court must "separately apply the presumption against extraterritoriality" when it determines whether to provide a private right of action for damages. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2106 (2016). By extension, even if the Constitution applies extraterritorially, a court should hesitate to provide an extraterritorial

---

[22] The critical administrability issue, of course, is the uncertain scope of an extraterritorial *Bivens* claim. A court could attempt to tailor its holding to the facts of this case, thereby making sure the plaintiffs win—at least, at the motion to dismiss stage. But that will hardly deter the next plaintiff in the next case. During enforcement operations on the U.S.-Mexico border, it is not unusual for Border Patrol officers to be shot at or otherwise attacked from the Mexico side during patrols on land, on water, and in the air. If the dissenters' position here prevails, whenever Border Patrol officers return fire in self-defense, and someone gets hurt in Mexico, *Bivens* suits will follow. Moreover, nothing written by the dissent herein assures that if *Bivens* should apply here, no case will be filed against the Nevada-based operator of a drone flown far beyond our borders.

damages remedy with "potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." *Id.* at 2106.

The D.C. Circuit squarely addressed the issue of extraterritoriality in the *Bivens* context and concluded that it constituted a "special factor." *See Meshal*, 804 F.3d at 425-26. Like this case, the D.C. Circuit's decision in *Meshal v. Higgenbotham* involved a challenge to "the individual actions of federal law enforcement officers" for an injury that occurred on foreign soil. *Id.* at 426. Refusing to extend *Bivens*, the court noted that "the presumption against extraterritoriality is a settled principle that the Supreme Court applies even in considering statutory remedies." *Id.* at 425. Given this presumption, the court concluded that extraterritoriality was a special factor. Concurring, Judge Kavanaugh stressed that "[i]t would be grossly anomalous . . . to apply *Bivens* extraterritorially when we would not apply an identical statutory cause of action for constitutional torts extraterritorially." *Id.* at 430 (Kavanaugh, J., concurring). We agree. Not only would it be "anomalous," it would contravene the separation-of-powers concerns that lie at the heart of the "special factors" concept.

Having weighed the factors against extending *Bivens*, we conclude that this is not a close case. Even before *Abbasi* clarified the "special factors" inquiry, we agreed with our sister circuits that "[t]he only relevant threshold— that a factor 'counsels hesitation'—is remarkably low." *See De La Paz v. Coy*, 786 F.3d 367, 378 (5th Cir. 2015) (quoting *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009) (en banc)). Here, extending *Bivens* would interfere with the political branches' oversight of national security and foreign affairs. It would flout Congress's consistent and explicit refusals to provide damage remedies for aliens injured abroad. And it would create a remedy with uncertain limits. In its remand of *Hernandez,* the Supreme Court chastened this court for ruling

on the extraterritorial application of the Fourth Amendment because the issue is "sensitive and may have consequences that are far reaching." *Hernandez*, 137 S. Ct. 2003, 2007 (2017). Similar "consequences" are dispositive of the "special factors" inquiry. The myriad implications of an extraterritorial *Bivens* remedy require this court to deny it.

For these reasons, the district court's judgment of dismissal is **AFFIRMED**.

No. 12-50217

JAMES L. DENNIS, Circuit Judge, concurring in the judgment:

In my view, we need not decide the difficult question of whether a *Bivens* remedy should be available under the circumstances of this case because, under Supreme Court precedent, Agent Mesa is entitled to qualified immunity. I find compelling the plaintiffs' arguments that Hernández was entitled to protections under the Fourth Amendment in light of *Boumediene v. Bush*, 553 U.S. 723 (2008), and the circumstances surrounding the border area where Mesa shot and killed him. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2008–11 (2017) (Breyer, J., joined by Ginsburg, J., dissenting). But the extraterritorial application of these protections to Hernández was not clearly established at the time of Mesa's tortious conduct. Mesa is therefore entitled to qualified immunity. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights." (internal quotation marks omitted)).

The plaintiffs contend that questions about the extraterritorial application of constitutional protections do not preclude Mesa's liability. After all, according to the complaint, Mesa essentially committed a cold-blooded murder.[1] Surely every reasonable officer would know that Mesa's conduct was unlawful, the plaintiffs argue. While that is a fair point, I believe this argument is foreclosed by Supreme Court precedent, which holds that the right

---

[1] The majority opinion states, "The FBI reported that . . . a group of young men began throwing rocks at [Mesa] from the Mexican side of the border" and asserts that Mesa "fired several shots toward the assailants." Maj. Op. at 2. That statement is not compatible with the plaintiffs' complaint in this case, which alleges that Hernández was "standing safely and legally" on Mexican soil, "defenseless," "offering no resistance," and not threatening Mesa in any way. The complaint also alleges that the FBI's statement—before discovering that a video of the incident existed—that Mesa fired at rock-throwers who surrounded him was "a false and reprehensible cover-up statement."

giving rise to the claim—here, Hernández's Fourth Amendment rights—must be clearly established.  *See Davis v. Scherer*, 468 U.S. 183, 197 (1984).

In *Davis v. Scherer*, the Supreme Court held, "A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that *those* rights were clearly established at the time of the conduct at issue."  *Id.* (emphasis added). The Court stated that "officials can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages."  *Id.* at 195.  In light of *Davis*, the plaintiffs' argument that Mesa forfeited his qualified immunity because his conduct was shockingly unlawful cannot succeed.  I am therefore compelled to concur in affirming the district court's dismissal of the plaintiffs' claims.

No. 12-50217

HAYNES, Circuit Judge, concurring:

I concur in the judgment and with the majority opinion's conclusion that *Bivens* should not extend to the circumstances of this case. I write separately to note that when we previously heard this case en banc, it was consolidated with two other appeals, which alleged issues arising under the Alien Tort Statute and Federal Tort Claims Act. *See Hernandez v. United States*, 785 F.3d 117, 139 (5th Cir. 2015) (Haynes, J., concurring). Those appeals and claims are not before us today, and they need not be addressed to resolve the *Bivens* claim against Mesa.

No. 12-50217

EDWARD C. PRADO, Circuit Judge, joined by GRAVES, Circuit Judge, dissenting:

Today's en banc majority denies Sergio Hernandez's parents a *Bivens* remedy for the loss of their son at the hands of a United States Border Patrol agent. The majority asserts that the transnational nature of this case presents a new context under *Bivens* and that special factors counsel against this Court's interference. While I agree that this case presents a new context, I would find that no special factors counsel hesitation in recognizing a *Bivens* remedy because this case centers on an individual federal officer acting in his law enforcement capacity. I respectfully dissent.

I do not take issue with the majority's framework for analyzing whether there are special factors counseling hesitation. "[S]eparation-of-powers principles are or should be central to the analysis." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). And the majority's analysis purports to consider these principles by appropriately asking "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *See id.* at 1857–58. However, in conducting this analysis, the majority is quickly led astray from the familiar circumstances of this case by empty labels of national security, foreign affairs, and extraterritoriality. These labels—as we say in Texas—are all hat, no cattle.

The majority repeatedly attempts to frame this case around the issue of whether aliens injured abroad can pursue *Bivens* remedies. That characterization, however, overlooks the critical who, what, where, when, and how of the lead actor in this tragic narrative. This case involves one federal officer "engaged in his law enforcement duties" in the United States who shot and killed an unarmed, fifteen-year-old Mexican boy standing a few feet away.

23

No. 12-50217

The Supreme Court in *Abbasi* went to great lengths to indicate support for the availability of a *Bivens* remedy in exactly the circumstances presented here: an instance of individual law enforcement overreach. As the Court recently reaffirmed in no uncertain terms, *Bivens* is "settled law . . . in [the] common and recurrent sphere of law enforcement." *Abbasi*, 137 S. Ct. at 1857. For the following reasons, I would retain *Bivens* in that common sphere and recognize a remedy for this senseless and arbitrary cross-border shooting at the hands of a federal law enforcement officer.[1]

The Supreme Court directed this Court "to consider how the reasoning and analysis in *Abbasi* may bear on this case," so that is where I begin. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017). In *Abbasi*, aliens detained for immigration violations following the September 11 attacks brought a class action suit against high-level federal executive officials and detention facility wardens. 137 S. Ct. at 1852–54. The detainees alleged that they had been detained in harsh conditions, including that they were confined in tiny cells for over 23 hours a day, subjected to regular strip searches, denied basic hygiene products and most forms of communication, and subjected to regular verbal and physical abuse by guards. *Id.* at 1853. Detainee-plaintiffs brought their *Bivens* claims alleging that the detention and policies authorizing it violated their Fourth and Fifth Amendment rights. *Id.* at 1853–54. After finding the case presented a new *Bivens* context because it challenged "confinement

---

[1] While the majority's opinion casts aspersions on the viability of plaintiffs' Fifth Amendment claim, I continue to disagree. As I discussed at length in my original panel majority opinion and in my original en-banc concurrence, a noncitizen injured outside the United States as the result of arbitrary official conduct by a law enforcement officer located in the United States should be entitled to invoke the protections provided by the Fifth Amendment. *See Hernandez v. United States*, 757 F.3d 249, 267–72 (5th Cir. 2014) (original panel opinion); *Hernandez v. United States*, 785 F.3d 117, 134–39 (5th Cir. 2015) (en banc) (Prado, J., concurring). However, I focus here only on the "antecedent" question regarding the availability of a *Bivens* remedy. *See Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017).

conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack"—a far cry from the three *Bivens* cases the Court had approved in the past—the Court determined that several special factors counseled hesitation that precluded a *Bivens* remedy against the executive officials. *See id.* at 1860–63.

The Supreme Court's analysis of four special factors in *Abbasi* is particularly relevant given the vastly different circumstances presented in this case. First, the Court took issue with the fact that the detainees sought to hold high-level federal executive officials liable for the unconstitutional activity of their subordinates. *See Abbasi*, 137 S. Ct. at 1860. The Court warned that "*Bivens* is not designed to hold officers responsible for the acts of their subordinates." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Because "[t]he purpose of *Bivens* is to deter the *officer*," a *Bivens* claim should be "brought against the individual official for his or her own acts, not the acts of others." *Id.* (quoting *F.D.I.C. v. Meyer*, 510 U.S. 471, 485 (1994)). Relatedly, the *Abbasi* Court found it problematic that that the detainees challenged a broad governmental policy, specifically the government's response to the September 11 attacks. *Id.* at 1860–61. The Court noted that "a Bivens action is not 'a proper vehicle for altering an entity's policy.'" *Id.* at 1860 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). Third, the Court disapproved of the fact that the detainees' claims challenged "more than standard 'law enforcement operations.'" *Id.* at 1861 (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 273 (1990)). Specifically, the Court found the detainees' claims involved "major elements of the Government's whole response to the September 11 attacks, thus . . . requiring an inquiry into sensitive issues of national security." *Id.* Finally, the Court found it of "central importance" that *Abbasi* was not a "damages or nothing" case. *Id.* at 1862. In contrast to suits challenging "individual instances of discrimination or law

enforcement overreach," the *Abbasi* plaintiffs challenged "large-scale policy decisions concerning the conditions of confinement imposed on hundreds of prisoners" which could be remedied with injunctive and habeas relief. *Id.* at 1862–63.

Not only are all four of these special factors notably absent here, but this case also presents the limited circumstances in which *Abbasi* indicated a *Bivens* remedy would exist. First, Hernandez's parents do not seek to hold any high-level officials liable for the acts of their subordinates. Instead, and strictly comporting with *Bivens*, plaintiffs are suing an individual federal agent for his own actions. *See Abbasi*, 137 S. Ct. at 1860 ("[A] *Bivens* claim is brought against the individual official for his or her own acts."). Relatedly, in suing an individual officer, Hernandez's parents do not challenge or seek to alter any governmental policy. To the contrary, the constitutional constraints Hernandez's parents seek mirror existing Executive Branch policy for Border Patrol agents. Department of Homeland Security regulations and guidelines already require Border Patrol agents to adhere to constitutional standards for the use of lethal force, regardless of the subject's location or nationality.[2] Furthermore, as a case against a single federal officer, this suit would not require unnecessary inquiry or discovery into governmental deliberations or policy-making—certainly not any more than any other regularly permissible *Bivens* suit alleging unconstitutional use of force by a Border Patrol agent. *See,*

---

[2] The regulations provide that "[d]eadly force may be used only when [a Customs and Border Protection ("CBP") officer] has reasonable grounds to believe that such force is necessary to protect the designated immigration officer or other persons from the imminent danger of death or serious physical injury." 8 C.F.R. § 287.8(a)(2)(ii); *see also* United States Customs and Border Protection, *Use of Force Policy, Guidelines and Procedures Handbook* 1 (2014), *available at* https://www.cbp.gov/sites/default/files/documents/UseofForcePolicyHand book.pdf ("CBP policy on the use of force by Authorized Officers/Agents is derived from constitutional law, as interpreted by federal courts in cases such as *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985), federal statutes and applicable DHS and CBP Policies.").

*e.g.*, *Martinez–Aguero v. Gonzalez*, 459 F.3d 618, 620–25 (5th Cir. 2006); *Valdez-Ortega v. Does*, No. 92-7772, 1993 WL 560259, at *1–2 (5th Cir. Dec. 27, 1993). Third, this case has nothing to do with terrorism, nor does it involve a high-level governmental response to a major national security event. Rather, plaintiffs merely challenge "standard 'law enforcement agent operations.'" *See Abbasi*, 137 S. Ct. at 1861. While the majority attempts to link this case to border security, which I address separately below, there is no question that a case which involves only one Border Patrol agent and a fifteen-year-old boy is a far cry from *Abbasi*, which involved broad and sensitive national security policies following the deadliest terrorist attack in U.S. history. Finally, unlike the detainees in *Abbasi*, who had several alternative remedies including habeas relief, this is a "damages or nothing" case for Hernandez's parents. *See id.* at 1862. It is uncontested that plaintiffs find no alternative relief in Mexican law, state law, the Federal Tort Claims Act ("FTCA"), the Alien Tort Statute ("ATS"), or federal criminal law[3] for their tragic loss. Nor can injunctive or habeas relief redress the irreparable loss of life here. Indeed, individual

---

[3] After an investigation, the Department of Justice declined to seek criminal or civil charges against Agent Mesa. *See* Dept. of Justice, Office of Public Affairs, *Federal Officials Close Investigation into Death of Sergio Hernandez–Guereca* (Apr. 27, 2012), *available at* http://www.justice.gov/opa/pr/federal-officials-close-investigation-death-sergio-hernandez-guereca. This inaction does not appear to be unusual. According to a December 2013 report by the *Arizona Republic*, "[t]he Department of Justice has not been able to show any cases in which it recommended civil or criminal charges against a CBP agent or officer who killed in the line of duty in at least the past six years," and "[a]n extensive review by *The Republic* also found no instances." Bob Ortega & Rob O'Dell, *Deadly Border Agent Incidents Cloaked in Silence*, Ariz. Republic (Dec. 16, 2013, 9:58 PM), *available at* http://www.azcentral.com/news/politics/articles/20131212arizona-border-patrol-deadly-force-investigation.html?nclick_check=1. Additionally, the United States government refused to extradite Agent Mesa to Mexico for criminal prosecution. Brief for the Gov't of the United Mexican States as Amicus Curiae in Support of Appellants on Rehearing En Banc, at 8 (Jan. 15, 2015). The fact that one Border Patrol agent in Arizona is currently being prosecuted for a cross-border murder provides little comfort to Hernandez's parents and little deterrence for future shootings—particularly if we foreclose any hope of a damages remedy here.

instances of law enforcement overreach—as alleged here—are by "their very nature . . . difficult to address except by way of damages actions after the fact." *Id.* Given that a *Bivens* cause of action is plaintiffs' only available remedy, compensatory relief by way of *Bivens* is both necessary *and* appropriate in this case. *See Bivens*, 403 U.S. at 407 (Harlan, J., concurring) ("The question then, is, as I see it, whether compensatory relief is 'necessary' or 'appropriate' to the vindication of the interest asserted.").

The special factors identified by the majority do not convince me that the Judiciary is not "well suited . . . to consider and weigh the costs and benefits of allowing a damages action to proceed"—particularly given the relatively straight-forward events here. *See Abbasi*, 137 S. Ct. at 1858. I disagree that recognizing a *Bivens* remedy in this case "threatens the political branches' supervision of national security." According to the majority, national security is implicated because the events giving rise to this suit took place at the border, thereby affecting border security and the operations of the Border Patrol. Relying on the Third Circuit's rejection of *Bivens* liability in the airport security context for a First Amendment retaliation claim, the majority also reasons that implying a *Bivens* remedy in the transnational context "increases the likelihood that Border patrol agents will 'hesitate in making split second decisions.'" *See Vanderklok v. United States*, 868 F.3d 189 (3d Cir. 2017).

While the shooting in this case took place at the border, it does not follow that border security and the operations of the Border Patrol are significantly implicated. As the original panel majority noted, this case "involves questions of precisely *Bivens*-like domestic law enforcement and nothing more." *Hernandez v. United States*, 757 F.3d 249, 276 (5th Cir. 2014). Plaintiffs allege that an individual Border Patrol agent while on duty on U.S. soil shot and killed an unarmed fifteen-year-old boy. If recognizing a *Bivens* remedy in this context implicates border security or the Border Patrol's operations, so too

would any suit against a Border Patrol agent for unconstitutional actions taken in the course and scope of his or her employment. Yet, as the majority recognizes, Border Patrol agents are unquestionably subject to *Bivens* suits when they commit constitutional violations on U.S. soil. *See, e.g.*, *De La Paz v. Coy*, 786 F.3d 367, 374 (5th Cir. 2015); *Martinez–Aguero*, 459 F.3d at 620–25; *Valdez-Ortega*, 1993 WL 560259, at *1–2. It make little sense to argue that a suit against a Border Patrol agent who shoots and kills someone standing a few feet beyond the U.S. border implicates border and national security issues, but at the same time contend that those concerns are not implicated when the same agent shoots someone standing a few feet inside the border.

Moreover, the practical rationale given by the majority for not recognizing a *Bivens* remedy—that Border Patrol agents will hesitate making split-second decisions—is one more commonly and more appropriately invoked in the qualified immunity context. *See Graham*, 490 U.S. at 396–97 (holding that the excessive force qualified immunity analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation"); *see also Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 582 (5th Cir. 2009) ("Importantly, qualified immunity purposefully shields police officers' split-second decisions made without clear guidance from legal rulings."). Given that the qualified immunity analysis already incorporates this practical concern, it is odd to invoke it at this stage, particularly when such concerns could be raised in nearly any *Bivens* suit against a federal law enforcement officer. *See Bivens*, 403 U.S. at 396 (failing to raise concern about hesitation by federal agents in tense search and arrest situations and holding that "no special factors counsel[ed] hesitation"). Indeed, although the majority does not reach the issue

of qualified immunity, Agent Mesa has and could continue to raise it as a possible defense to the constitutional claims against him.

Finally, I am troubled by the majority's reliance on a First Amendment retaliation case to raise this "national security" concern. In *Vanderklok*, the Third Circuit considered whether under *Bivens* "a First Amendment claim against a TSA employee for retaliatory prosecution even exists in the context of airport security screenings." *Vanderklok*, 868 F.3d at 194. While the court refused to recognize such a claim in light of the new context presented and various special factors counseling hesitation, one such special factor the court found particularly relevant was the fact that "TSA employees typically are not law enforcement officers and do not act as such." *Id.* at 208. The court noted that "TSA employees are not trained on issues of probable cause, reasonable suspicion, and other constitutional doctrines that govern law enforcement officers." *Id.* Here, by contrast, Agent Mesa is a federal law enforcement officer well-trained on relevant constitutional doctrines and permissible use of force. *See generally* United States Customs and Border Protection, *Use of Force Policy, Guidelines and Procedures Handbook* (2014). In light of Agent Mesa's status as a federal law enforcement officer, the practical concerns raised in *Vanderlock* pertaining to non-officer TSA employees in the First Amendment retaliation context have little bearing here.

Indeed, *Abbasi* itself cautions against taking the very path the majority errantly takes in this case. "[N]ational-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" *Abbasi*, 137 S. Ct. at 1862 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)). As one prominent legal scholar has warned, "national security" justifications are "increasingly becom[ing] the rule in contemporary civil litigation against government officers" and threaten to "dilute the effectiveness of judicial review as a deterrent for any and all unlawful

government action—not just those actions undertaken in ostensibly in defense of the nation." Steven I. Vladeck, *The New National Security Canon*, 61 Am. U. L. Rev. 1295, 1330 (2012). When one looks to substantiate the invocation of national security here, one is left with the impression that this case more closely resembles ordinary civil litigation against a federal agent than a case involving a true inquiry into sensitive national security and military affairs, which are properly committed to the Executive Branch. *See Abbasi*, 137 S. Ct. at 1861. On this record, I would not so readily abdicate our judicial role given the fundamental rights at stake here. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) ("Whatever power the United States Constitution envisions for the Executive in its exchanges with other nations or with enemy organizations in times of conflict, it most assuredly envisions a role for all three branches when individual liberties are at stake.").

The majority also invokes concerns about interference with foreign affairs and diplomacy as a special factor counseling hesitation. Asserting that the United States is always responsible to foreign sovereigns when federal officials injure foreign citizens on foreign soil, the majority argues that extending a *Bivens* remedy here implicates "delicate diplomatic matters." However, isn't the United States equally answerable to foreign sovereigns when federal officials injure foreign citizens on domestic soil? Again, the majority's argument proves too much. As plaintiffs persuasively argue, if there is a "U.S. foreign policy interest [implicated] in granting or denying a *Bivens* claim to foreign nationals, it is difficult to see how that interest would apply only if the injury occurred abroad." It also bears repeating that Agent Mesa's actions took place within the United States.

I also fail to see how recognizing a *Bivens* remedy here would undermine Mexico's respect for the Executive Branch or create tension between Executive and Judicial determinations. No case holds that a court must first consider

31

whether the Executive Branch has found evidence of criminality before determining whether a civil *Bivens* remedy exists for a given constitutional violation. Further, the majority fails to acknowledge that distinct standards of proof govern civil and criminal proceedings making different outcomes in these proceedings hardly the stuff of an international diplomatic crisis. *See Addington v. Texas*, 441 U.S. 418, 423–24 (1979) (distinguishing between civil and criminal standards of proof). Even if one accepts that a Judicial finding of *Bivens* liability combined with an Executive Branch refusal to prosecute or extradite would undermine a foreign country's respect for the Executive Branch, it is difficult to explain how such concerns are only present when a foreign national is injured abroad, but not when a foreign national is injured in the United States. It is unclear how recognizing a *Bivens* remedy for the unconstitutional conduct of a single federal law enforcement officer acting entirely within the United States would suddenly inject this Court into sensitive matters of international diplomacy. Much as with national security, "the Executive's mere incantation of . . . 'foreign affairs' interests do not suffice to override constitutional rights." *Def. Distrib. v. United States Dep't of State*, 838 F.3d 451, 474 (5th Cir. 2016) (Jones, J., dissenting).

The majority also points to Congress's failure to provide a damages remedy as an additional factor counseling hesitation. Noting that the language of 42 U.S.C. § 1983 limits damage remedies to "citizen[s] of the United States or other person[s] within the jurisdiction thereof," the majority first argues that *Bivens* as the "judicially implied version of section 1983" cannot reach further than § 1983. However, it is just as likely that by specifying "other persons within the jurisdiction" Congress intended to extend a § 1983 remedy beyond U.S. citizenship, rather than commenting on its availability for wrongful conduct by state actors with extraterritorial effects. Indeed, Congress enacted § 1983 "in response to the widespread deprivations of civil rights in

the Southern States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers." *Felder v. Casey*, 487 U.S. 131, 147 (1988) (citing *Patsy v. Bd. of Regents of State of Fl.*, 457 U.S. 496, 503–05 (1982)). Furthermore, while a *Bivens* action is often described as "analogous" to a § 1983 claim, *Butts v. Martin*, 877 F.3d 571, 588 (5th Cir. 2017), the Supreme Court has "never expressly held that the contours of *Bivens* and § 1983 are identical." *Malesko*, 534 U.S. at 82 (Stevens, J., dissenting).

The other statutes highlighted by the majority fail to indicate that Congress expressly intended to preclude a remedy in the circumstances presented here. For instance, the FTCA's exclusion of "claim[s] arising in a foreign country," *see* 28 U.S.C. § 2680(k), was meant to codify "Congress's "unwilling[ness] to subject the United States to liabilities depending upon the *laws of a foreign power*." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 707 (2004) (quoting *United States v. Spelar*, 338 U.S. 217, 221 (1949)) (emphasis added). Notably, *Bivens* seeks to remedy violations of United States constitutional protections, and the FTCA expressly does "not extend or apply to a civil action . . . for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). Additionally, any exception for federal officials under the Torture Victim Protection Act of 1991 ("TVPA") has little to say about the availability of a *Bivens* claim here. The TVPA provides a remedy for extrajudicial killings and torture at the hands of individuals acting under color of foreign law. *See* 106 Stat. 73, note following 28 U.S.C. § 1350. However, these individuals would not have been subject to *Bivens* liability anyways because *Bivens* is limited to federal officials acting pursuant to federal law. *Dean v. Gladney*, 621 F.2d 1331, 1336 (5th Cir. 1980) (describing *Bivens* as creating "a remedy against federal officers, acting under color of federal law"); *Kundra v. Austin*, 233 F. App'x 340, 341 (5th Cir. 2007) ("[A] *Bivens* action requires that the defendant be a federal officer acting under color of federal law.").

It is also important to note that *Abbasi* found Congress's failure to provide a remedy to the detainees in that case notable because Congressional interest in the government's response to the September 11 terrorist attack "ha[d] been 'frequent and intense' and some of that interest ha[d] been directed to the conditions of confinement at issue." *Abbasi*, 137 S. Ct. at 1862 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988)); *see also id.* (noting that at Congress's behest the Department of Justice produced a 300-page report on the confinement conditions at the relevant detention facility). By contrast here, Congressional interest in cross-border shootings has been negligible making it more likely that congressional inaction is inadvertent rather than intentional. *See id.* (noting that where Congressional attention is high "it is much more difficult to believe that 'congressional inaction' was 'inadvertent'"). Indeed, as courts have recognized in the statutory interpretation context, drawing inferences from Congress's silence is a difficult and potentially dangerous exercise. *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306 (1988) ("This Court generally is reluctant to draw inferences from Congress' failure to act."); *La. Health Serv. & Indem. Co. v. Rapides Healthcare Sys.*, 461 F.3d 529, 537 (5th Cir. 2006) ("As is often the case, congressional silence whispers sweet nothings in the ears of both parties."); *McGill v. E.P.A.*, 593 F.2d 631, 636 (5th Cir. 1979) ("The debate concerning the significance of congressional silence is almost as difficult to resolve as Bishop Berkeley's famous question concerning whether there is noise when a tree falls in the forest and no one is present to hear it."); *Castro v. Chi. Hous. Auth.*, 360 F.3d 721, 729 (7th Cir. 2004) (noting that "inferences from congressional silence are treacherous").

Finally, the majority asserts that "the extraterritorial aspect of this case" is itself a special factor counseling hesitation. Looking to the fact that Hernandez was standing on Mexican soil when he was shot, the majority fears the uncertain scope of *Bivens* liability—extending even to U.S.-based military

No. 12-50217

drone operators—were we to recognize a *Bivens* remedy here. The majority's concern about the effects of such a decision is understandable and I do not take it lightly. However, the limited and routine circumstances presented here of individual law enforcement action as well as established Supreme Court precedent on *Bivens* claims in the military context assure me that there is little danger that recognizing a *Bivens* remedy here will open a Pandora's Box of liability.

First, as I emphasize above, this case is not *sui generis* among *Bivens* cases. In the "common and recurrent sphere of law enforcement," courts across the country routinely administer *Bivens* claims against federal officers for unconstitutional actions occurring within the United States. *See Abbasi*, 137 S. Ct. at 1857. I readily acknowledge Hernandez was standing on the Mexican side of the culvert when he was shot, but it cannot be forgotten that Agent Mesa was acting from the American side of the culvert. It is hard to understand how the mere fact that a plaintiff happens to be standing a few feet beyond an unmarked and invisible line on the ground would suddenly create a host of administrability concerns or a systemwide impact on governmental operations that would not otherwise exist if the plaintiff was standing a few feet within the United States. As ordinary *Bivens* litigation against a federal law enforcement officer seeking damages for unconstitutional use of force, "the legal standards for adjudicating the claim pressed here are well-established and easily administrable." *Engel v. Buchan*, 710 F.3d 698, 708 (7th Cir. 2013) (noting that extending a *Bivens* remedy for alleged *Brady* violations under the Due Process Clause presented "no great problem of judicial interference with the work of law enforcement, certainly no greater than the Fourth Amendment claim in *Bivens*").

But even the majority's concerns about liability for overseas drone operations are also unlikely to materialize. Even assuming foreign nationals

35

injured at the hands of U.S. military personnel overseas could state valid constitutional claims—a hotly debated topic—the Supreme Court has already repeatedly rejected *Bivens* claims in the military context. *See Chappell v. Wallace*, 462 U.S. 296 (1983) (rejecting *Bivens* claims brought by Navy sailors against superior officers who had allegedly mistreated them on the basis of race); *United States v. Stanley*, 483 U.S. 669 (1987) (rejecting *Bivens* claims brought by a former soldier against military and civilian officials who allegedly surreptitiously dosed him with LSD to study its effect on humans). Furthermore, it is likely that such claims would actually implicate various special factors counseling hesitation specifically identified in *Abbasi* such as requiring a true inquiry into national security issues, intruding upon the authority of the Executive Branch in military affairs, and actually causing officials "to second-guess difficult but necessary decisions concerning national-security policy." *See Abbasi*, 137 S. Ct. at 1861.

In sum, this Court is more than qualified to consider and weigh the costs and benefits of allowing a damages action to proceed. This case simply involves a federal official engaged in his law enforcement duties acting on United States soil who shot and killed an unarmed fifteen-year-old boy standing a few feet away. I would elect to recognize a damages remedy for this tragic injury. As Chief Justice John Marshall wrote, "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 5 U.S. 137, 163 (1803). In this case, I would recognize a *Bivens* remedy for this senseless cross-border shooting at the hands of a federal law enforcement officer. Therefore, I respectfully dissent.